**SCRIPTOMATIC, INC., Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. 69–2791.**

United States District Court, E. D. Pennsylvania.

June 23, 1975.

Daniel Mungall, Jr., Philadelphia, Pa., for plaintiff.

Stephen T. Lyons, Tax Div., Dept. of Justice, Washington, D. C., for defendant.

## OPINION

DITTER, District Judge.

■ The question in this case is whether certain debentures which purported to evidence corporate indebtedness were, for federal income tax purposes, in reality shares of stock. Contending payments to debenture holders were interest, the corporation took deductions which were disallowed by Internal Revenue. The tax difference was then paid and this suit brought for its recovery. A jury having found against the taxpayer, appropriate motions for post trial relief are now before the court. I conclude that judgment for plaintiff, notwithstanding the verdict, must be awarded.

Fischer Machine Company is a Pennsylvania corporation that builds and sells machines and parts. In 1946 it created a wholly owned subsidiary, Sicorp, to market patented addressing machines under the name "Scriptomatic."

Sicorp entered into an agreement with Resources and Facilities Corporation (REFAC) in 1959 to market these addressing machines overseas. The founder and president of REFAC is Eugene M. Lang. In 1960, he and Sicorp organized a Switzerland corporation, Scriptomatic S. A., to market Scriptomatic products in Europe. Lang held 25 per cent and Sicorp 75 per cent of the new company.

By 1962 Herbert W. Leonard was president of Sicorp. He had been employed by the company since 1951 and was principally responsible for the growth of its business. George Kooch was also employed by Sicorp in the middle 1950's and by 1962 was responsible for the production side of its operations.

In the late 1950's and early 1960's, Sicorp's business flourished. By 1962, however, it became apparent that computers would soon wrest away the market served by the large-sized Scriptomatic machines and that Sicorp would have to develop another market to survive. As a result, Leonard and Kooch produced two new machines that could be sold to small companies needing addressing service but which could not afford an expensive computer system. At the end of 1962, about a dozen of the smaller, less expensive machines had been sold, and Sicorp's executives felt it was in a favorable position to gain a good share of the addressing machine business. This was estimated to be somewhere between $125,000,000. and $200,000,000. a year. Lang testified that the overseas addressing market was as large as that of the United States and prospects for a significant share were good since the competition would be less severe.

In discussing a transition from large to small machines, Leonard discovered that Fischer's owner was reluctant to invest the additional capital required and was considering the sale of Sicorp. He then requested and received an option to purchase the company. Leonard contacted Lang and with him agreed to form a group of investors for the acquisition of Sicorp.

Lang in turn went to Walter Mann, an individual with great entrepreneurial and financial experience, who had assisted Lang in forming another successful company some years before. Given the leadership of this enterprise, Mann quickly got in touch with various individuals and institutional investors. After a series of negotiations, Leonard, Kooch, Lang, and Mann concluded that the demands of prospective institutional investors were unacceptable and so they decided to go ahead and exercise the option, obtaining the money necessary to purchase the corporation from their own resources and those of their friends.

As a result, Fischer and Mann, who acted as agent for the group of investors, entered into an agreement. By its terms, the investors purchased the whole business of Sicorp including assets,

goodwill, and trademarks. Fischer's inventory of addressing machine parts was to be paid for by a series of notes, retirable over a two year period, and payments for Fischer's patents were in accordance with a royalty arrangement. Thus, a new corporation, Scriptomatic, Inc., came into existence.

Originally it was planned that Leonard, Kooch, Lang and Mann were to get 33⅓ percent of the common stock while other investors were to get 66⅔ percent. This division was based on the fact that Leonard and Kooch not only contributed the option to purchase Sicorp but their managerial abilities which were essential to the future success of Scriptomatic. Lang and Mann, on the other hand, received their shares for promoting the successful financing of the company. However, the investors decided that Leonard and Kooch should be provided with an incentive. Therefore, approximately five per cent of the shares were placed in escrow on the understanding that Leonard and Kooch would receive them contingent upon Scriptomatic's achieving $100,000. of net retained earnings by 1966. This was readily accomplished in a much shorter time so that the actual capitalization of Scriptomatic, as modified by the escrow agreement, was as follows:

| | Number of Shares | Percentage |
|---|---|---|
| Herbert Leonard & George Kooch | 2,205 | 28% |
| Eugene Lang | 551.25 | 7% |
| Walter Mann | 262.50 | 3⅓% |
| Other Investors | 4,856.25 | 61⅔% |
| | 7,875 | 100% |

In January, 1963, Scriptomatic issued 3,018.75 shares of common stock to Leonard, Kooch, Lang and Mann for a consideration of one dollar a share. Simultaneously, it also issued 4,856.25 shares of common stock tied to 5,250 one hundred dollar, ten year, seven per cent subordinated debentures. Units of .925 shares of common stock accompanied each debenture. Thereafter, the 4,856.-25 shares were valued in plaintiff's books on the basis of $10. a share or $48,562.50. The balance of the $525,000 was attributed to the subordinated debentures and treated as a corporate debt.

Scriptomatic began to pursue successfully the small addressing machine business. In 1965, the Board of Directors decided that additional working capital was needed for expansion. In late November of that year, the company offered its stockholders a chance to subscribe to a second eight year, seven percent subordinated debenture (Series "B") that was offered in units of four shares of $1.00 par value common stock and a $1000. debenture. One hundred ninety-six units were offered, one for every 25 shares of common stock, and all were purchased by Scriptomatic shareholders.

Scriptomatic's record of debt repayment during the period in question, 1963 to 1968, was excellent. First, the serial notes payable quarterly to Fischer for its inventory were paid when due. Second, from time to time after March, 1964, Scriptomatic borrowed substantial amounts from banks and other sources. There was no default either in the interest or balance due on these loans. Finally, during the years 1963 through 1968 while plaintiff paid no dividends on its stock, interest payments on both the original and Series B debentures were timely made in accordance with the terms of the instruments.

Scriptomatic's earnings record from 1963 to 1968 shows it was a flourishing and growing enterprise. Sales increased from $1.7 million in 1963 to over $3.4 million in 1968. Net earnings also reflected an expanding business, rising from $54,261. to $187,303. in the same period.

In January, 1967, a merger was proposed through which Scriptomatic shareholders would exchange their common stock for shares of REFAC. Rolf Merton, representing himself and N. V. Handelmaatschappj Antilla, a substantial debenture owner, objected to the

merger. Merton testified that he and Antilla were unwilling to accept this plan because it would have changed the character of their investment. They had loaned money to Scriptomatic but did not want to be creditors of REFAC. In order to effectuate the merger, plaintiff, in April, 1967, paid in full the debentures held by Antilla ($137,000), Merton ($20,000), Brown Bros. Harriman ($5000), and Kooch ($24,400). Thereafter, all the common shares of Scriptomatic (8,659) were exchanged for 288,633 shares of REFAC and it became REFAC's wholly owned subsidiary.

In June, 1968, the remaining debentures were repaid in accordance with the redemption provision of the debenture agreements. Most of the funds were obtained by a short-term loan.

Scriptomatic timely filed its federal tax returns for the years 1963 through 1968, claiming interest and debt discount amortization deductions with respect to the debentures as follows:

| Year | Original Subordinated Debentures | Series B Subordinated Debentures |
|------|----------------------------------|----------------------------------|
| 1963 | 40,395.29 | |
| 1964 | 41,606.28 | |
| 1965 | 41,606.28 | |
| 1966 | 41,606.28 | 9,221.33 |

These deductions were disallowed by the Internal Revenue Service, the tax deficiencies were paid, this suit followed, and a jury found for the defendant. Plaintiff's motions are for judgment notwithstanding the verdict, or alternatively, for a new trial.

I. Introduction

■ In order to grant a motion for judgment notwithstanding the verdict the court must find there is only one conclusion a reasonable man viewing the evidence might make. *Thomas v. E. J. Korvette, Inc.,* 476 F.2d 471, 474 (3d Cir. 1973); *Neville Chemical Co. v. Union Carbide Corp.,* 422 F.2d 1205, 1210 (3d Cir. 1970); *Gatenby v. Altoona Aviation Corp.,* 407 F.2d 443, 445 (3d Cir. 1969). The standard to apply is aptly set forth by the Fifth Circuit:

On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidence—not just that evidence which supports the non-mover's case —but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions, is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different ent conclusions, the motions should be denied . . . .

*Boeing Co. v. Shipman,* 411 F.2d 365, 374 (5th Cir. 1969); accord, *Alterman Foods, Inc. v. United States,* 505 F.2d 873, 875 (5th Cir. 1975); *Houston Chronicle Publishing Co. v. United States,* 481 F.2d 1240, 1264 (5th Cir. 1973).

There is no dispute as to any fact in this case. To the contrary, most of them have been stipulated. There is no issue of credibility and I have reviewed the evidence in a light most favorable to defendant. That being so, I conclude, as a matter of law, both debentures issued by plaintiff were debt in fact as well as in form, and therefore plaintiff's motion for judgment notwithstanding the verdict must be granted.

■ In a case involving the question of whether, for tax purposes, shareholder advances to a corporation should be treated as debt or equity the burden is on the taxpayer to prove the advances are indeed indebtedness and not a capital contribution. *P. M. Finance Corp. v. Commissioner of Internal Revenue,* 302 F.2d 786, 789 (3d Cir. 1962).

The difficulty in determining whether Scriptomatic has met this burden is in

deciding exactly which standard to apply. The last time the Supreme Court dealt with this issue, Mr. Justice Reed declared that the difference between the interest on corporate debt and the dividend on a capital asset was so well understood that no further definition was necessary. *John Kelley Co. v. Commissioner of Internal Revenue*, 326 U.S. 521, 530, 66 S.Ct. 299, 304, 90 L.Ed. 278, 283 (1946). The succeeding Sphinx-like silence from the Supreme Court has forced each Circuit to establish its own standards.[1] See, e. g., *A. R. Lantz Co. v. United States*, 424 F.2d 1330, 1333 (9th Cir. 1970); *Tyler v. Tomlinson*, 414 F.2d 844, 848 (5th Cir. 1969). The result has been a plethora of ambiguous and contradictory opinions. Warren, *The Corporate Interest Deduction: A Policy Evaluation*, 83 Yale L.J. 1585, 1605 (1974).

The Third Circuit has grappled with this problem, and in *Fin Hay Realty Co. v. United States*, 398 F.2d 694 (3d Cir. 1968), enunciated a list of sixteen criteria to apply. Subsequently, in *Trans-Atlantic Co. v. Commissioner of Internal Revenue*, 469 F.2d 1189, 1192–93 (3d Cir. 1972), Judge Van Dusen, who dissented in *Fin Hay*, stated that the court heavily relied on four other factors. Most recently, Judge Garth, in *Joseph Lupowitz Sons, Inc. v. Commissioner of Internal Revenue*, 497 F.2d 862, 865–66 (3d Cir. 1974), applied both the sixteen *Fin Hay* factors and the four cited by Judge Van Dusen.

However as Judge Freedman aptly pointed out in *Fin Hay*:

neither any single criterion nor any series of criteria can provide a conclusive answer in the kaleidoscopic circumstances which individual cases present. . . .

398 F.2d at 697. See also *Berkowitz v. United States*, 411 F.2d 818, 820 (5th Cir. 1969).[2] Thus, the enumerated factors are only aids in analyzing the realities of a transaction, that is, whether the infusion of money by a shareholder into a closely held corporation is actually a contribution of further capital, subject to the hazard of the business venture, or a true loan, creating a valid creditor-debtor relationship.

■ In analyzing the facts before me I must separately consider three facets of this transaction: (a) its form, (b) the intent of the parties, and (c) the objective economic reality as it relates to the risk taken by the investors. Plumb, *The Federal Income Tax Significance of Corporate Debt: A Critical Analysis and a Proposal*, 26 Tax L.Rev. 369, 410–17 (1971).

II.   Form

At the end of the evidentiary portion of the trial, I concluded as a matter of law that both the original and Series B subordinated debentures were in the form of debt instruments. This determination was opposed by the Government. Nevertheless, an examination of both can only lead to the conclusion I reached. On their face, these debentures contain all the formal rights and remedies that satisfy the legal requirements necessary to create an enforceable obligation.

A.   Maturity and Certainty of Payment

■ First, the instruments are labeled subordinated debentures and not

1. One commentator has identified thirty-eight separate factors that courts have considered when deciding if corporate obligations are debt or equity. Holzman, *The Interest-Dividend Guideline*, 47 Taxes 4 (1969).

2. Mortimer Caplin observed that the problem with this type case is not the standards as much as the inconsistency of the courts in applying them. He described the adjudicative process, at least as far as the Tax Court is concerned, as one in which the court examines all the circumstances, refuses to be bound by prior decisions,

relies apparently on an internal reaction to the "propriety" of the transaction, and then assembles a combination of previously enunciated standards to sustain its conclusion . . . . .

Caplin, *The Caloric Count of a Thin Corporation*, 17 NYU Tax Inst. 771, 811, 43 Marq.L.Rev. 31 (1959).

preferred stock. They contain a written, unconditional promise to pay on a specified date a sum certain in money.[3] Thus, the obligation is evinced by a writing which is not founded upon some sort of contingency, for example earnings, that might give the instrument the attributes of stock. Most importantly, there is a provision for a fixed date when the debentures would mature. The absence of such an unconditional right to demand payment is usually conclusive that it is an equity investment. Plumb, supra at 413. See *Fin Hay,* supra (criteria 13); *Lupowitz,* supra (criteria b, e, f, and g). The instruments also contain the right to force complete payment in the event of a default in payment of either interest or principal. *Fin Hay,* supra (criteria 11).

### B. Adequate Interest Rate

Next, the debentures have a fixed interest rate that is not contingent upon either discretionary action of the board of directors or upon Scriptomatic's attaining net earnings. To the contrary, the instruments call for seven percent interest, payable semi-annually, whether or not the company makes a profit. Davis Rice Longaker, senior vice president of Provident National Bank, testified[4] that at the time the debentures were issued the prime lending rate was between 4½ percent and 5 percent and that many commercial loans were made at as much as 2 percentage points higher depending upon the circumstances. Rolf A. Merton also testified that one of the major considerations for his and Antilla's investment in Scripto-

matic was the favorable interest rate. Therefore, it seems evident that this was not a case of nominal or no interest; rather, the company offered a substantial rate of return for that period. See *Fin Hay,* supra (criteria 10 and 12); *Lupowitz,* supra (criteria b and f).

### C. Participation in Success of the Venture

The fact that an investor was entitled to participate in the success of the venture, since common stock was issued with each debenture, did not automatically convert the indebtedness into equity. This was true because an investor's equity participation could be separated from his status as a creditor. The equity kicker attached to Scriptomatic's debentures was, in fact, a further inducement for prospective debenture purchasers. Package sales are common corporate practice and in many cases where a debenture was accompanied by warrants or convertible into stock, courts have found them to be valid debt. Plumb, supra at 434–37. Further evidence of indebtedness is the fact that the debentures have no provision for participation in management by the holder. *Fin Hay,* supra (criteria 3 and 9).

### D. Subordination

The Government asserts the debentures were really shares of stock because they were subordinated to all other forms of corporate indebtedness, including trade creditors. However, after studying the subordination agreements and hearing the testimony of the witnesses, I ruled as a matter of law that the language of paragraph 107(c)[5] did

---

3. Int.Rev.Code of 1954, § 385(b)(1). In the Tax Reform Act of 1969, Congress authorized the IRS to promulgate regulations necessary to determine whether an interest in a corporation should be treated as debt or equity. As of this date the IRS has not issued any such regulations. Some of the factors that I discuss are set forth in this Act.

4. A stipulation by counsel that only the last day notes of testimony be transcribed was approved by the court. Therefore, all references to testimony by witnesses are from my notes and best recollection.

5. 107 The term "Superior Indebtedness" as used herein shall mean

   [(a) indebtedness to banks or financial institutions

   (b) notes or debentures to a bank or trust company]

   (c) indebtedness incurred, assumed or guaranteed by the Company in connection with acquisition by it of its properties and assets, or acquisition by it or any subsidiary of any other business, properties or other assets (unless, in the case of clauses (a) and (b) above, and

not automatically place tradesmen and vendors in a position superior to that of the debenture owners. The uncontradicted testimony revealed that it was the intention of Scriptomatic to have the debentures subordinated to the notes given Fischer for the inventory of Scriptomatic parts and future bank loans, but not other creditors.

█ Although a subordination clause, such as the one found in these debentures, tends to reduce the characteristics of the creditor-debtor relationship, *P.M. Finance Corp. v. Commissioner of Internal Revenue*, supra, 302 F.2d at 789–90, it should not, by itself, control the issue. Only if the subordination is combined with other indications can the instrument be identified as equity. *Harlan v. United States*, 409 F.2d 904, 907–08 (5th Cir. 1969); Plumb, supra at 421–24.

By every test, then, the form of these debentures was that of debt instruments.

### III. Intent

In a corporation which has numerous shareholders with varying interests, the arm's-length relationship between the corporation and a shareholder who supplies funds to it inevitably results in a transaction in which form mirrors substance. Where the corporation is closely held, however, and the same persons occupy both sides of the bargaining table, form does not necessarily correspond to the intrinsic economic nature of the transaction, for the parties may mold it at their will with no countervailing pull. This is particularly true where a shareholder can have the funds he advances to a corporation treated as corporate obligations instead of contributions to capital without affecting his proportionate equity interest. *Fin Hay*, supra, 398 F. 2d at 697.

this clause (c), by the terms of such instruments creating or evidencing the indebtedness it is provided that such indebtedness is not superior in right of payment to the Debentures).

█ Thus, my determination that these debentures on their face have the attributes of debt instruments is not conclusive. The next question is whether they were intended to be debt instruments by their owners or intended to reflect further equity investments. Plumb, supra at 458. Intent to act like a creditor cannot be inferred from statements of stockholders or read from their minds by the court; it can only be ascertained from objective factors.

### A. Treatment

It is undisputed that Scriptomatic observed all the formalities in regard to the debentures. It entered them on its books as debt, always treated them as debt, paid interest when due, and redeemed the debentures as provided for in their redemption provision. *Fin Hay*, supra, 398 F.2d at 696 (criteria 14). In fact, both parties stipulated that the conduct of Scriptomatic and the debenture holders was in accordance with the provisions of the instruments: there was no deferment of interest, no postponement of principal, nor anything else at variance with the strict language contained in the agreements.

### B. Proportionality

The Government argues one factor nullifies the other objective indicia that the debenture holders intended to create a true creditor-debtor relationship, that is, the alleged proportionality of equity and debt holdings. The Government claims that since the debentures were issued in the same proportions as the shares, the debentures are in reality a disguised capital contribution.

Proportionality has been held to be relevant evidence that creates a strong inference that the debt is actually equity. *Charter Wire, Inc. v. United States*, 309 F.2d 878, 880 (7th Cir. 1962), *cert. denied*, 372 U.S. 965, 93 S.Ct. 1090, 10

*See* Callegar, *Purposes and Uses of Subordination Agreements*, 23 Bus.Law. 33, 37–38 (1967) where the author warns lawyers to give careful consideration to the definition of senior debt.

L.Ed.2d 129 (1963); *see Fin Hay,* supra (criteria 2); *Lupowitz,* supra (criteria a). Nevertheless, while it may make the debtor-creditor relation suspect, other factors must combine with proportionality to justify an inference that a debenture holder actually intended to treat his investment as stock rather than debt. Plumb, supra at 470–71.

The fact that holdings of shares and debentures were not in proportion, on the other hand, can create an inference that the instruments are in fact debt and were intended to be treated that way. The more disproportionate the holdings, the stronger is the inference, since a true creditor will want the obligations of the instrument enforced no matter what the effect on shareholders may be. Plumb, supra at 474–75.

It is unchallenged that 62 percent of the initial issue of Scriptomatic shares was distributed proportionately to the purchasers of the first subordinated debenture issue. However, the four individuals who organized the company got 38 percent of the shares with no accompanying debentures. Initially, therefore, there was wide disparity between the major stockholders and the debenture holders. Although Leonard, Kooch, Lang, and Mann did buy additional stock and thus became debenture holders too, their purchases were not in proportion to their original share holdings. The most dramatic change was that of Lang who originally had seven percent of the shares, but by purchase of shares and debentures for himself, children, and REFAC came to control 38.7 percent of the stock and hold 39.1 percent of the debentures. Thus, from the beginning of Scriptomatic, there was substantial disproportionality between stock and debenture ownership. See Appendix A. As the company progressed, other investors either bought stock, the debentures, or both, from some of the original investors. Finally, when the Series "B" Subordinated Debentures were offered to Scriptomatic stockholders, purchases were not proportional to stock holdings. In fact, two of the five major stockholders did not subscribe at all and one shareholder, Gausti, who owned no debentures, bought some of the second series. This is the type of capitalization which creates varying interests since those who provide the financing will be ·inclined to act like creditors to protect the bulk of their investment, which is, debt not equity. Plumb, supra at 480–81. See *Piedmont Minerals Co. v. United States,* 429 F.2d 560, 563 (4th Cir. 1970); Stone, *Debt-Equity Distinctions in the Tax Treatment of the Corporation and its Shareholders,* 42 Tul.L.Rev. 251, 258, 262 (1968).

Furthermore, Rolf Merton stated that he and Antilla, which bought twenty percent of the debentures, were primarily attracted to the Scriptomatic package because of the favorable interest rate. When Lang proposed the incorporation of Scriptomatic into REFAC, Merton testified he objected, stating that he and Antilla only wanted to be creditors of Scriptomatic as a separate independent company and not as a subsidiary of REFAC, thereby forcing the redemption of their debentures before the merger could be consummated.

Proportionality between purchases of equity and purported debt is not a vice, but a test for economic reality. Like all tests, it may be fallible. Here, analysis shows there was no true proportionality between stock and debenture ownership at the time of the original issue, and even less at the time the Series "B" debentures were sold. To the extent that proportionality was present, there were also different and conflicting economic interests which existed from Scriptomatic's earliest days and which surfaced when the merger into REFAC was proposed. Only one inference can reasonably be drawn from this record: the form of the debentures mirrored the intent of their holders to treat the instruments as indicative of corporate debt and nothing more.

## IV. Economic Reality

Even though money advanced to a corporation is in the form of debt and even though the parties intended to treat it as debt, the ultimate question is whether the investment, analyzed in terms of economic reality, constitutes risk capital, subject to the fortunes of the venture, or whether it represents a strict debtor-creditor relationship. *Fin Hay*, supra, 398 F.2d at 697 (criteria 6). See *Midland Distributors, Inc. v. United States*, 481 F.2d 730, 733 (5th Cir. 1973); *Dillin v. United States*, 433 F.2d 1097, 1103 (5th Cir. 1970).

Several criteria have been suggested as aids to analyzing economic reality.

### A. Debt-Equity Ratio and Core Assets Test

In *John Kelly Co. v. Commissioner of Internal Revenue*, 326 U.S. 521, 526, 66 S.Ct. 299, 302, 90 L.Ed. 278 (1946), the Court noted the possibility that a corporation may have nominal capitalization and an obviously excessive debt structure, a factor that would indicate an instrument evidenced equity rather than debt. The inordinate ratio of debt to equity, 400 to 1, was pointed out in *Lupowitz*, supra, 497 F.2d at 866, and the "thinness" of the capital structure in relation to debt is one of the criteria listed in *Fin Hay*, supra, 398 F.2d at 696. *Lupowitz* cites with approval *Tyler v. Tomlinson*, supra, 414 F.2d at 848, where it is said:

> We have been careful to note that "thin capitalization" is "very strong evidence" of a capital contribution where: "(1) the debt to equity ratio was high to start with, (2) the parties understood that it would likely go higher, and (3) substantial portions of these funds were used for the purchase of capital assets and for meeting expenses needed to commence operations." *United States v. Henderson*, 5 Cir. 1967, 375 F.2d 36 at 40.

The initial ratio in *Tyler* between debt and capital was 7 to 1, with subsequent loans making it 10 to 1.

Here, the capitalization of Scriptomatic in January, 1963, was just over $50,000. while the first debenture series was $525,000. Part of Scriptomatic's purchase from Fischer was of machine parts, financed by a series of notes which totaled $283,000. Thus, Scriptomatic's total indebtedness could be said to be $808,000., or 16 times its capitalization. Based on *Tyler*, this would appear to be an excessive amount of debt. However, an analysis of the nature of this debt and of the assets it was used to acquire is also necessary.

The "core assets" of a company are those which are essential to its operation —its buildings, machinery, patents, etc. Without these core assets there could be no production, no sales, no business. Core assets do not include, however, working capital, that is, those amounts needed to finance such things as inventory, accounts receivable, and payroll.

Scriptomatic's purchase from Fischer may be summarized as follows:

| | | |
|---|---:|---:|
| Fixed assets | | $45,500. |
| Liquid assets | | |
| Cash | $ 24,000. | |
| Receivables | 150,000. | |
| Inventory | 56,000. | 230,000. |
| Scriptomatic, S.A. | | 86,000. |
| Machine parts | | 283,000. |
| Total | | $644,500. |
| Less cash received | $24,000. | |
| Financed by notes to Fischer | 283,000. | 307,000. |
| Net cash outlay | | $337,500. |

The machine parts, acquired for $283,000. were paid for by two year notes which called for quarterly payments. These parts would properly be categorized as working capital, not core assets. Contained in this inventory was all work in process, a highly liquid asset in this as in most manufacturing operations. Moreover, since the first payment was not due for three months after Scriptomatic's purchase, inclusion of the full total of the notes to Fischer as "debt" in any ratio consideration creates

an unrealistic picture. Moreover, Scriptomatic's purchase included $150,000. in accounts receivable. The collectibility of these accounts was guaranteed, in effect, by Fischer, since there was a provision that Fischer would repurchase from Scriptomatic any account more than 120 days old. Thus, an accurate summary of Scriptomatic's core assets purchase from Fischer would be:

| | |
|---|---:|
| Fixed assets | $45,500. |
| Liquid assets, inventory | 56,000. |
| Scriptomatic, S.A. | 86,000. |
| | $187,500. |

It has been suggested that ideally a company's equity should be sufficient to acquire "core assets" because they are essential to the operation of the business, Caplin, *The Caloric Count of a Thin Incorporation,* 17 N.Y.U.Instit. Fed.Tax. 771, 820 (1959), and without them the company would be a mere shell. The money necessary to purchase such assets is said to be at the risk of the venture, and thus must be treated as capital contributions.

■ However attractive any analysis which yields automatic answers may be, for two reasons I cannot adopt it. First, to require, as a rule of law, that to avoid certain tax consequences a company must acquire its core assets solely with capital funds is unrealistic and unfair. It is not necessary that essential properties be acquired by paid in equity for a company to have a sound financial structure. In fact, it may be detrimental to tie up its total capital in that way. It is common business practice to obtain financing to buy core assets from many different sources. Banks, friends, small business investment companies and other financial institutions all have enabled countless businesses to purchase many, if not most of such assets with funds that are recognized as debt. Not allowing the same treatment to corporate advances simply because they come from stockholders is illogical.

Secondly, the converse is equally unacceptable. In many instances, working capital is crucial to the existence of a company and at the same risk of the venture as funds used to purchase core assets. For example, if the business is service oriented or labor intensive, it might be required to spend enormous sums to pay its employees while spending next to nothing for physical assets. To suggest that advances from the stockholders of such a corporation must be treated as debt because there was sufficient capital to pay for its essential assets does not represent reality. Plumb, supra at 522–23.

Having analyzed Scriptomatic's debt-equity ratio and its application of funds realized from the sale of the original debentures, I conclude that there was no basis for a finding that Scriptomatic was thinly capitalized or a disproportionate share of the debenture money was used to purchase core assets.

B.  Independent Creditor Test

■ One factor which most closely resembles the safe harbor the cases seek is the independent creditor test. Under this analysis, any stockholder advance should be treated as debt if an unrelated outside party would have advanced funds under like circumstances. *Fin Hay,* supra, 398 F.2d at 697 (criteria 4). Thus, if Scriptomatic could have raised $525,000. from outside creditors there is no question that the debentures should be treated as debt.

The Government stipulated that Scriptomatic could have sold both the original and Series "B" debentures to outside persons who had no prior interest in Scriptomatic if the debentures were issued on the same terms, conditions, and in conjunction with common shares. In turn, Scriptomatic admitted that it was unable to establish that an unrelated person would have purchased a debt instrument, similar to the seven percent subordinated debenture, solely for the interest to be earned, that is, without some equity acquisition in the corporation.

The fact that outsiders might have refused to advance money on the deben-

tures alone, however, is not significant. The economic realities of an entire transaction should be determined not by an analysis of a part but of the whole. It would make no sense to have answers to questions in this case determined by whether an outsider would have provided funds had there been a different interest rate or a different time for maturity. Eliminating the equity that went with the debentures would change the whole picture. The transaction that should be considered is the issuance of the debentures and the accompanying stock on the terms and conditions under which they were issued in 1963 and 1965. These are the transactions, the economic realty of which must be determined, and these transactions must be considered in their entirety.

The Government has agreed that outside sources would have purchased the debentures on the terms under which they were sold to stockholders. This fact makes a significant contribution to the conclusion that the debentures must be treated as debt instruments.

### C. Source of Payments and Risk

Since any business may run into unexpected difficulties and even fail, there is never any guarantee that money invested in an enterprise will be repaid—and much less assurance that there will never be postponements or defaults. Obviously, no matter what form a repayment instrument may take, all risks are greater when money is advanced to a small business just starting out than when it is advanced to a major company listed on the New York stock exchange.

Two useful criteria in analyzing economic reality objectively are "risk" and "source of payments." If an investor had a reasonable expectation of repayment in accordance with the terms of the instrument, the label applied to it is of significance. On the other hand, if there was no reasonable expectation that the company would abide by the terms

of the instrument, the advance should be considered capital without regard to the legal formalities employed. Although, as Justice (then Circuit Judge) Marshall observed, distinguishing between risk capital and a risky loan may be an elusive categorization, *Motel v. Commissioner of Internal Revenue*, 340 F.2d 445, 446 (2d Cir. 1965), it is nevertheless one which courts are required to make.

When money is advanced to a corporation in the form of debt, there are four possible sources of repayment: (1) liquidation of assets, (2) profits from the business, (3) cash flow, and (4) refinancing with another lender. Plumb, supra at 526. If repayment of the advances can only be reasonably assured by the chance of profits or from the liquidation of the business, the money is at the risk of the venture.

If, however, under the circumstances at the time of the advance, a prudent investor would have found there was a realistic and reasonable expectation of an adequate cash flow which would enable the new company to pay interest and eventually retire the instrument according to its terms, the objective economic realty dictates that a valid debt was created and a true creditor-debtor relationship came into being. Plumb, supra at 528.[6] The burden is, of course, on the taxpayer to establish that a reasonably prudent investor would have realistically believed that an adequate cash flow would exist. Such a conclusion cannot be based upon mere speculation or wishful thinking, but on concrete facts and sound assumptions about the company's future. See Hickman, *Incorporation and Capitalization: The Threat of the Potential Income Item and a Sensible Approach to the Problems of Thinness*, 40 Taxes 974, 987–88 (1962).

Judge Bryan Simpson correctly states that the most significant issue is

---

**6.** There is also the possibility that the debt can be recognized if it can be reasonably expected that outside financing would pay off the obligation. Plumb, supra at 529.

"whether at its [the company's] inception there was a reasonable expectation that the business would succeed on its own." *Plantation Patterns, Inc. v. Commissioner, of Internal Revenue,* 462 F.2d 712, 723 (5th Cir.), cert. denied, 409 U. S. 1076, 93 S.Ct. 683, 34 L.Ed.2d 664 (1972).

### D. Risk and Repayment Tests as Applied to Scriptomatic

Having analyzed Scriptomatic's potentialities as they would have appeared to an investor when the debentures were offered, I conclude first, that risk of default on the company's part was minimal, and second, that no other determination is reasonable from the record.

As previously observed, there is always some risk in every loan and all stock purchases. Unlike many new companies, however, Scriptomatic had a solid background in its field of endeavor. For over 15 years, its predecessor had been successfully producing and selling addressing machines. While it is true that demand was changing, Scriptomatic's managers, Leonard and Kooch, had developed and already sold several new machines of a type which would allow the company to compete successfully in the market of small users. Scriptomatic also owned an active European subsidiary which was entering a lucrative area of potential sales.

When Fischer was unwilling to make the necessary capital available for the production of a new line of addressing machines, those experienced in producing and selling contacted those who were experienced in financing. The investment offering which resulted combined an attractive interest rate and an opportunity to share in company ownership. Subordination to other debt was limited. Under these circumstances, those who considered extending money to Scriptomatic could soundly anticipate that there would be a sufficient cash flow to provide enough income to pay the interest and redeem the debentures when due. The business had a reasonable expectation of success and a minimal risk of failure. See *Piedmont Minerals Co. v. United States,* 429 F.2d 560, 563 (4th Cir. 1970); *Gloucester Ice & Cold Storage Co. v. Commissioner of Internal Revenue,* 298 F.2d 183, 185 (1st Cir. 1962).[7]

### E. Series "B" Debentures Considered Separately

To this point, there has been little need to analyze the Series "B" debentures, issued for $196,000. in December, 1965, apart from the original debentures issued for $525,000 in conjunction with Scriptomatic's organization in January, 1963. All that has been said about form, handling, and intent applies to both. Insofar as economic realities are concerned, however, there is a difference. If the original debentures are said to be equity because Scriptomatic's debt-equity ratio was too high, it is abundantly clear that there was no undercapitalization when the Series "B" debentures were sold. At that time, Scriptomatic had liabilities of $691,000., exclusive of the original debentures. Should these debentures be treated as equity, Scriptomatic's capital account would have totaled $663,000., as follows:

| | |
|---|---|
| Original Debentures and Stock | $528,000. |
| Retained Earnings | 135,000. |
| Total Capital | $663,000. |

In short, equity would only be slightly less than debt.

7. While the validity of the debentures must be judged by the conditions existing when issued, *Plantation Patterns, Inc. v. Commissioner of Internal Revenue,* 462 F.2d 712, 723 (5th Cir.), cert. denied, 409 U.S. 1076, 93 S.Ct. 683, 34 L.Ed.2d 664 (1972), I cannot completely disregard the subsequent history of Scriptomatic. The investor's expectations as to cash flow and net income for the company were more than justified (see Exhibit 22). Moreover, in the next two years various individuals and institutions bought common shares, debentures or both from the original investors. In fact, a brokerage house, Brown Bros. Harriman & Co., bought $5000. worth of debentures with no equity interest for its own account (see Exhibits 17 and 18).

If the economic realities are measured in the terms of what a prudent investor would do, Scriptomatic's earnings by December, 1965, were

| | |
|---|---|
| 1963 | $54,000. |
| 1964 | 7,000. |
| 1965 | 74,000. |
| Total | $135,000. |

That earning record, coupled with a debt-equity ratio of only slightly more than 1 to 1 and a history of never having defaulted on any obligation, would have established to even the most conservative investor that risk was minimal and that cash flow would generate sufficient moneys for the payment of interest and the repayment of principal when due. Therefore, if the Government's contention that the original debentures should be considered equity is correct, there is overwhelming reason why the Series "B" debentures must be treated as debt.

### V. *Fin Hay, Trans-Atlantic,* and *Lupowitz*

Three recent Third Circuit cases have all held that instruments which a taxpayer claimed evinced debt were in reality equity.

In *Fin Hay Realty Co. v. United States,* 398 F.2d 694 (3d Cir. 1968), Judge Freedman dealt with notes signed by a corporation for advances from its two owners, each of whom held equal proportions of stock and debt. He found that the debt holders did not act as creditors. Furthermore, the corporation could not have repaid the loans for many years, the notes representing a long term commitment dependent upon the increase in value of real estate, the only asset of the corporation. Finally, Judge Freedman held that since it was impossible in 1934 to obtain mortgage financing of any kind, no independent, prudent investor would have taken the risk of advancing money to Fin Hay Realty. Thus, the notes in question were treated as evidence of capital contributions.

In *Trans-Atlantic Company v. Commissioner of Internal Revenue,* 469 F.2d 1189 (3d Cir. 1972), Judge Van Dusen held that the corporate bonds were in fact equity investment because they were treated as equity.

Finally, Judge Garth pointed out in *Joseph Lupowitz Sons, Inc. v. Commissioner of Internal Revenue,* 497 F.2d 862 (3d Cir. 1974), that four related individuals had created two corporations. All had an equal share in both, and the officers in both were the same. Funds were freely transferred from one corporation to the other, but there was no document evincing these transactions, no enforceable obligations were created, and no provision for interest had been made. The advances were used to acquire an overwhelming portion of the capital assets, and the debt-equity ratio was in excess of 400 to 1. He further found that the advances represented a long term commitment which depended solely on the future value of real estate in order to be repaid; there was no other way in which the corporate debtor could have raised the necessary funds; and a prudent business man would not have invested in the unsecured obligations of the corporation. Thus, Judge Garth concluded that the advances were capital contributions.

The striking differences between the facts in these cases and the one at bar are further proof that the debentures here should be treated as debt.

### VI. Conclusion

In summary, the debentures in question were drafted to create a legally enforceable debtor-creditor relationship. They were treated as evidence of debt by their purchasers and by the corporation which issued them. Finally, the realities of Scriptomatic's economic situation do not require that the advances in question be treated as equity. I conclude that no other reasonable decision could be reached from the evidence in this case. Accordingly, the plaintiff is entitled to judgment notwithstanding the verdict.

## ORDER

And now, this 23rd day of June, 1975, after consideration of plaintiff's post trial motions and for the reasons expressed in the foregoing opinion, it is hereby ordered that:

1. Plaintiff's motion for a new trial is refused;

2. Plaintiff's motion for judgment notwithstanding the verdict is granted; and

3. The Clerk is directed to enter judgment for the plaintiff in the amount of $102,468.94 together with interest thereon.

## ORDER

And now, this 27th day of June, 1975, subparagraph (3) of the Order of June 23, 1975, in the above-captioned proceedings is hereby amended to read:

(3) As provided in paragraph "I" of the final pretrial order, within 30 days the parties shall enter their stipulation of the amount for which judgment shall be entered, but if for any reason the parties are unable to agree upon the amount of the judgment, the issue will be decided by the court following an appropriate hearing or hearings without a jury.

APPENDIX A

Share and Debenture Ownership
of those investing largest
amounts in Scriptomatic

|  | Original Stock Issue | January 1963 After Original Debentures | | December 31, 1965 Before Series "B" Debentures Issued | | January 1, 1966 After Series "B" Debentures Issues | |
|---|---|---|---|---|---|---|---|
|  | Share Percent | Share Percent | Debenture Percent | Share Percent | Debenture Percent | Share Percent | Debenture Percent |
| Leonard | 17.4 | 21.1 | 5.8 | 22.0 | 6.8 | 20.0 | 4.9 |
| Kooch | 10.4 | 12.8 | 3.7 | 13.6 | 4.6 | 12.4 | 3.4 |
| Lang | 7. | 36.4 | 47.6 | 38.7 | 39.1 | 40.6 | 44.5 |
| Mann | 3.2 | 11.2 | 12.8 | 8.0 | 10.3 | 8.4 | 10.9 |
| Antilla |  | 11.7 | 19. | 11.7 | 19. | 12.4 | 19.0 |