RICHARD B. THALER and SONIA R. THALER, et al., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Thaler v. Commissioner
Docket Nos. 591-75, 592-75 655-75
United States Tax Court
T.C. Memo 1978-24; 1978 Tax Ct. Memo LEXIS 492; 37 T.C.M. (CCH) 147; T.C.M. (RIA) 780024; January 19, 1978, Filed Richard B. Thaler, for the petitioners. W. Robert Abramitis, for *493 the respondent. WILBUR
MEMORANDUM FINDINGS OF FACT AND OPINION WILBUR, Judge: Respondent determined the following deficiencies in petitioners' Federal income taxes for the year 1971: Petitioners
Deficiency
Richard B. and
$2,782.50
Sonia R. Thaler
Manley H. and
$1,662.41
Doriseve Thaler
Louis K. and
$8,431.72
Rae Thaler
The issues for decision are (1) whether amounts advanced by petitioners to a corporation represented bona fide loans or contributions to the corporation's capital; and (2) to the extent the funds advanced to the corporation are considered to be loans, did they constitute business bad debts under section 166, [2] deductible as such in 1971. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioners resided in Ithaca, New York, at the time the petitions were filed in these consolidated cases. During the years from 1964 to 1971, and at all times material herein, petitioner Louis Thaler, and his sons, petitioners Manley and Richard Thaler, were *494 engaged in the trade or business of practicing law with offices in Ithaca, New York. From 1964 to 1971, and at all times material herein, petitioner Rae Thaler was a housewife, was not employed outside the home, nor was she engaged in any trade or business. Furthermore, none of the petitioners have ever engaged in the trade or business of lending money, the trade or business of forming or promoting corporations, or the trade or business of operating a retail drug store. In 1962, petitioners Richard, Manley and Louis Thaler, along with one other individual, organized Triphammer Development Co., Inc. (hereinafter Triphammer) for the purpose of the construction and operation of a shopping center in Ithaca, New York. The shopping center was completed in the late fall of 1963 and many of the tenants opened for business in the months of August, September, October and November of 1963. At all times after 1965, petitioners Richard, Manley and Louis Thaler each owned 33-1/3 percent of the total outstanding stock of Triphammer. The financing for the shopping center development involved three separate loans to Triphammer. The initial construction loan, in the amount of $900,000, with *495 interest at 6 percent per annum, was obtained from the Security National Bank of Long Island, New York, with a maturity date sometime in March of 1965. Petitioners sought permanent financing for the shopping center in the form of a first mortgage loan from at least two commercial lenders, the Rochester Savings Bank and the Central States, Southeast and Southwest Areas Pension Fund (hereinafter the Pension Fund). A commitment of funds in the amount of $1,300,000 at 6 percent per annum and payable over 20 years was received by petitioners as owners of Triphammer from the Rochester Savings Bank sometime in April of 1963.Under the terms of this commitment, the funds were to be advanced in full no later than November 30, 1963. A second commitment was received from the Pension Fund, this being for $1,350,000 at 6.5 percent per annum payable over 20 years with a balloon payment at the end of the 20th year, and requiring petitioners to personally guarantee the first $200,000 of the indebtedness. Disbursement of funds pursuant to this loan commitment could in no event be required prior to September 1, 1966 nor after March 1, 1967. The appraisals of the fair market value of the shopping *496 center development made in 1964 and 1965 in connection with Triphammer's applications for permanent financing respectively listed the value at $2,220,000 and at $1,550,00. Acceptance of the commitment from the Pension Fund by Triphammer on March 17, 1965 required interim financing of the project, which financing was arranged with the LaSalle National Bank of Chicago, Illinois by April 8, 1965. Among the items contained in the petitioners' various applications for permanent financing were representations that the shopping center would include a drug store. The area of the shopping center reserved for a drug store was originally leased to one Leon Herrick, who, as it turned out, was unwilling or unable to actually commence operation of a drug store upon completion of the shopping center. Consequently, sometime after April 1, 1963 but before September 1, 1963, petitioners Richard, Manley and Louis Thaler, together with Joseph Smythe and Louis Cramer, organized the Mall Pharmacy, Inc. (hereinafter sometimes referred to as the Pharmacy) to own and operate a retail drug store in the Triphammer Shopping Center at a monthly rental of $850. Each of these five incorporators contributed *497 $2,000 to the Mall Pharmacy, Inc. and received 20 percent of the outstanding stock, for a total equity investment of $10,000. The Pharmacy opened for business sometime about September 1, 1963 with an opening inventory valued at approximately $30,000, financed by the $10,000 equity investment, by a loan from the Tompkins County Trust Company (the Bank) in the amount of $10,000, and by trade notes from wholesalers. Throughout its existence, the Pharmacy had trade notes or trade accounts payable that were continuously paid off and renewed, the trade accounts payable generally increasing in amount over time as the size of the inventory increased. [3] The Pharmacy also continued to borrow money from the bank, with the indebtedness to the Bank at one point exceeding $53,500. [4] These loans were necessary for the operation of the business and were evidenced by 90-day renewable notes that were periodically paid and renewed. The Thaler men were required to endorse each and every note given to the bank for these loans, although on two occasions less than all three of the Thalers actually endorsed the notes. The notes to the bank were ultimately paid by the Pharmacy from the proceeds from *498 the sale of the business in 1971. Smythe was president of the Mall Pharmacy from its inception, and was responsible for the day-to-day operation of the drug store and for maintaining its books and records. Sometime in January or February of 1964, however, it was *499 discovered that Smythe had a drug related problem, at which time he terminated his status as an employee and shareholder of the Pharmacy. Subsequent to Smythe's departure, the remaining owners of the Pharmacy made an informal audit of the financial records and the inventory of the drug store, and, for the first time, became aware that the Pharmacy was not making money, although it was not clear whether this situation was the result of Smythe's activities or the operation of the business. [5]
*500 Shortly, thereafter, John Kavis, a pharmacist who purchased Smythe's stock in the Pharmacy, began to operate the store and keep its books and records. It was about this time (early in 1964) that petitioners began to advance money to the Pharmacy. These advances were evidenced by 6 percent demand promissory notes and were designated in the financial statements of the Pharmacy as notes payable,affiliates. The following is a summary of the dates, amounts and payees of the notes: Date *
Amount
Petitioner
1/23/64
$6,000
Rae Thaler
4/10/64
2,000
Rae Thaler
5/12/64
4,000
Rae Thaler
7/15/64
3,000
Richard B. Thaler
7/30/64
4,000
Manley H. Thaler
11/6/64
3,000
Rae Thaler
4/31/65
1,000
Manley H. Thaler
7/30/65
250
Richard B. Thaler
7/30/65
250
Manley H. Thaler
7/30/65
900
Rae Thaler
2,000
Richard B. Thaler
The total *501 amounts advanced by petitioners Richard, Manley, and Rae Thaler to the Pharmacy were, respectively, $5,250, $5,250 and $15,900. Advances to the Pharmacy were also made by shareholders who are not petitioners herein totaling $15,600 by the end of the fiscal year ending July 31, 1965. In April of 1971, the assets of the Mall Pharmacy were sold to a drug store chain which also made arrangements to lease the premises previously occupied by the Pharmacy in the Triphammer Shopping Center. The proceeds from the sale were used by the Pharmacy to satisfy, in full, the obligations to the bank. The remainder of the proceeds were applied against the trade accounts and notes payable, with these creditors receiving approximately 30 to 40 cents on the dollar. Petitioners Richard, Manley and Rae Thaler received no payment with respect to their advances to the Pharmacy from the proceeds of sale.Moreover, at no time during the operation of the Pharmacy did petitioners ever receive any amounts as salary or wages from the drug store business. On their 1971 joint Federal income tax returns, petitioners Richard B. and Sonia R. Thaler, Manley H. and Doriseve Thaler, and Louis K. and Rae Thaler deducted *502 $5,250, $5,250 and $15,900, respectively, as business bad debts. Respondent disallowed these deductions in their entirety as business bad debts, asserting that these amounts represented either corporate capital contributions or nonbusiness bad debts, neither of which amount is deductible in full against ordinary income, but rather the deduction of which is limited under sections 1211(b) and 166(d)(1)(B), respectively. OPINION Petitioners Richard, Manley and Rae Thaler advanced money to a corporation, the Pharmacy, in which petitioners Richard, Manley, and Louis Thaler were shareholders. These advances were neither repaid by the Pharmacy during its life, nor were any of the advances repaid when the Pharmacy sold its assets, thereby terminating its corporate existence. The characterization of the loss with respect to these advances is the issue before the Court. The respondent argues that the advances are in fact an equity investment, with their worthlessness resulting in a long-term capital loss. Alternatively, respondent argues that to the extent that advances represent loans which became worthless, they are deductible by petitioners only as nonbusiness bad debts under section *503 166(d) because the advances were not proximately related to petitioners' trade or business. The first issue we must decide is whether the amounts advanced by petitioners to the Pharmacy in 1964 and 1965 were loans or contributions to the corporation's capital. The characterization of advances is a question of fact to be determined from all the evidence, with the burden of establishing that the advances were loans resting on the taxpayer. See Gilbert v. Commissioner,262 F.2d 512, 514, (2d Cir. 1959), cert. den. 359 U.S. 1002 (1959), affirming a Memorandum Opinion of this Court; Matthiessen v. Commissioner,194 F.2d 659, 661 (2d Cir. 1952), affg. 16 T.C. 781 (1951). [6]In attempting to deal with this problem of characterization, a number of criteria have been isolated by which to evaluate the true nature or substance of an investment which is in form a debt. [7] However, no single criterion nor any series of criteria can provide a *504 conclusive answer to whether advances are loans. See John Kelley Co. v. Commissioner,326 U.S. 521, 530 (1946). Therefore, the various factors considered in the numerous cases on this issue are merely aids in analyzing whether the economic realities of the transaction more nearly resemble a debtor-creditor relationship or that of an investor whose investment constitutes risk capital entirely subject to the fortunes of the corporate venture. Gilbert v. Commissioner,248 F. 2d 399, 406 (2d Cir. 1947), remanding a Memorandum Opinion of this Court; Helvering v. Richmond, F. & P.R. Co.,90 F. 2d 971 974 (4th Cir. 1937), affg. 33 B.T.A. 895 (1936). *505 Factors which are of particular significance in determining the economic reality of shareholder advances include the capitalization of the corporation (debt-equity ratios), the use of the funds advanced, potential sources of repayment and the concomitant risk of nonpayment, and comparability with loans by independent creditors. See Plumb, "The Federal Income Tax Significance of Corporate Debt: A Critical Analysis and a Proposal," 26 Tax L. Rev. 369, 503-537 (1971); Scriptomatic, Inc. v. United States,397 F. Supp. 753 (E.D. Pa. 1975), affd. 555 F.2d 364 (3d Cir. 1977).
After applying the above factors to the record before us, we are convinced that the amounts advanced by petitioners constitute contributions to capital. The Pharmacy initially began operation September 1, 1963 with $10,000 of equity capital, $10,000 of capital loaned by a bank, and a line of credit from suppliers of trade merchandise sufficient to enable the Pharmacy to stock approximately $30,000 in inventory. Within 6 months from its inception, about the time of Mr. Smythe's *506 departure, it became apparent that the Pharmacy needed additional funds to pay various obligations and to meet other operational requirements. Funds for these purposes were obtained by increasing the "trade" credit and from advances in early 1964 in the amount of $16,000,-$8,000 each from petitioner Rae Thaler and from Mrs. Louis Cramer. By the end of July 1964, the Pharmacy had obtained additional funds to meet current expenditure requirements in the form of increased bank credit (approximately $2,600) and advances by shareholders and nonshareholders in the amount of $19,000; by the end of July 1965, the advances and bank credit had each been increased by an additional $7,000. Although an examination of these financial data does not conclusively establish the Pharmacy as a corporation which was inadequately capitalized, the circumstances do suggest a corporation continually in need of cash during the period in which the advances were made. This period coincided with the early years of the business and constitutes evidence that the organizers of the corporation failed to provide the equity capital foreseeably necessary to carry on its planned level of operations. See, e.g., *507 Arlington Park Jockey Club v. Sauber,262 F.2d 902 (7th Cir. 1959). This persistent need for cash, arising almost at the inception of the business and continuing throughout its early years, and the need for the advances to meet the day-to-day requirements of the business, are factors bearing significantly on the reasonableness of the expectation of repayment, as well as the extent of the capital which was available to protect the purported creditors from the effects of business losses and declines in the value of inventory. See Ambassador Apartments, Inc. v. Commissioner,50 T.C. 236, 245 (1968), affd. 406 F.2d 288 (2d Cir. 1969).Therefore, it is reasonable to conclude that repayment of the advances could only be foreseeably projected from the eventual liquidation or sale of the buiness, a view which the petitioners shared, in which case the advances must be considered to be at the risk of the business, and consequently an equity investment. American-LaFrance-Foamite Corporation v. Commissioner,284 F. 2d 723, 725 (2d Cir. 1960), affg. a Memorandum Opinion of this Court, cert. denied 365 U.S. 881 (1961). *508 The independent creditor test also provides a useful analytical framework for ascertaining the economic reality of purported debt. According to this test, shareholder advances are compared with the form which a similar transaction would have taken had it been between the corporation and an outside lender. "[If] the shareholder's advance is far more speculative than what an outsider would make, it is obviously a loan in name only." Fin Hay Realty Co. v. United States,398 F. 2d 694, 697 (3d Cir. 1968). In the instant case, there is evidence that during the period in which advances were made to the Pharmacy, credit was also extended to the Pharmacy by a bank. It is not clear exactly how much additional credit was extended during this period, nor were the precise terms of the bank credit presented by the parties. However, it appears from the available evidence that the advances by petitioners were not made under conditions comparable to those required by the Bank. The bank loans were evidenced by interest-bearing 90-day renewable notes and required endorsement (guarantees) *509 by the shareholders in the Pharmacy, petitioners Richard, Manley and Louis Thaler. On the other hand, the advances by petitioners are characterized by the absence of any realistic creditor safeguards. Petitioners advanced money to an unproved business which had depleted its capital through operating losses. No security was required for the repayment of the advances, nor was it demonstrated that there would be cash flow adequate to eventually repay the purported debt. The advances were evidenced by notes which contained no fixed maturity dates (demand notes), under circumstances which strongly suggest that there would be no attempt to demand repayment if such payment was to the detriment of the business. In fact, no such demand was ever made by petitioners, although in 1 year the Pharmacy was able to pay a moderate dividend to its shareholders. Moreover, these claims were effectively subordinated to all outside creditors when upon liquidation petitioners failed to share with the trade creditors in the partial recovery from the proceeds of the sale of the assets of the Pharmacy. When confronted with these facts, particularly in light of the previously developed factors indicating *510 that repayment was very unlikely absent liquidation of the business, we conclude that disinterested creditors would not advance money on terms comparable to those made by petitioners. Petitioners emphasize the formal relationship of debtor and creditor surrounding the advances. The advances were undeniably evidenced by debt instruments, 6 percent demand notes. It is petitioners' contention that this formal indicia of debt; the alleged periodic payments of interest thereon; [8] and their reason for not sharing with other creditors in the proceeds from the bulk sale of the business assets (to preserve their acknowledged reputation for fiscal probity essential to their business) are adequate to characterize the advances as debt. For the reasons expressed above, however, we consider these factors insufficient to overcome the indicia of equity and hold that the advances by petitioners were contributions to capital. However, even assuming *511 that petitioners properly characterized these advances as debts, we agree with respondent's alternative contention that they were not business debts. If a debt is a business bad debt, it is fully deductible against ordinary income. Section 166(a)(1). On the other hand, if the bad debt was not a business bad debt, then the loss must be treated as a short-term capital loss subject to the limitations of section 1211. Section 166(d). [9]
*512 In order to qualify for the business bad debt deduction, petitioner must show that he was engaged in a trade or business and that the bad debt was proximately related to it. Section 1.166-5(b), Income Tax Regs. In determining whether the loss is proximate to his trade or business, rather than his investment interest as a shareholder, considerations relating to petitioners' trade or business must be the dominant motive for making the loan. The dominant motive test was adopted by the Supreme Court in United States v. Generes,405 U.S. 93, 103 (1972): We conclude that in determining whether a bad debt has a "proximate" relation to the taxpayer's trade or business, as the Regulations specify, and thus qualifies as a business bad debt, the proper measure is that of dominant motivation, and that only significant motivation is not sufficient. * * * The determination of petitioner's dominant motive is essentially a factual inquiry, with the burden of *513 proof on petitioner. Smith v. Commissioner,55 T.C. 260 (1970), remanded for consideration in light of Generes at 457 F.2d 797 (5th Cir. 1972), opinion on remand 60 T.C. 316 (1973). Section 1.166-5(b), Income Tax Regs.
Petitioners contend that the advances to the Mall Pharmacy were made to protect their reputation as lawyers within the small community where they practiced.However, petitioners have not sustained their burden of proving that their dominant motive for making the advances was related to their law practice. Petitioners made an investment in a shopping center. Their investment in the Mall Pharmacy was a subsidiary but integrated part of this investment, having nothing to do with their law practice. While petitioners desired to dispose of the Mall Pharmacy as soon as an appropriate purchaser could be found, this objective is not inconsistent with an investment motive in advancing funds to the Pharmacy. Petitioners contend that they hoped to be paid for the advances from the eventual sale or liquidation of the Mall Pharmacy, and again this is consistent with investment motives. Additionally, *514 petitioners had guaranteed bank loans advanced to the Mall Pharmacy. It is certainly understandable that they would be interested in advancing funds to the Pharmacy to enable it to overcome its earlier financial difficulties, and become a viable operation ultimately providing a return of petitioners' investment. It is undoubtedly true that petitioners were men of integrity and respected members of the bar with excellent reputations in their community. Their desire to preserve this reputation may have played a minor and possibly even significant role in advancing the funds. However, the chronology of the events and the relationship of the Mall Pharmacy to the overall investment in the shopping center, convinces us that the advances were only tenuously connected with taxpayers' law practice.Certainly, we cannot say on this record that petitioners have carried their burden of proving that the dominant motive for making advances to the Mall Pharmacy was related to their law practice. Decisions will be entered for the respondent. Footnotes
1. Pursuant to the parties' joint motion, cases of the following petitioners were consolidated for purposes of trial, briefing, and opinion: Manley H. Thaler and Doriseve Thaler, docket No. 592-75; and Louis K. Thaler and Rae Thaler, docket No. 655-75.↩
2. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable year in question.↩
3. According to the available financial statements of the Mall Pharmacy, Inc., the inventory and the trade payables at various dates were as follows: Inventory
Trade Notes
Trade Accounts Period Ending
(historical cost)
Payable
Payable
4/30/64
$ 48,876.12
$20,448.47
$26,692.64
7/31/64 (End of first fiscal year: 10 months.) *↩
46,403.00
24,899.28
18,288.48
7/31/65
62,705.00
4,439.20
38,081.93
7/31/66
84,748.59
0
29,410.30
7/31/67
108,468.81
0
40,204.84
7/31/68
121,390.18
0
59,066.29
7/31/69
111,301.32
0
62,588.78
4. According to the available financial statements of the Mall Pharmacy, Inc., the indebtedness to the bank can be summarized as follows ↩ Period Ending
Notes Payable, Bank
4/30/64
$ 9,800.00
7/31/64
12,400.00
7/31/65
19,285.00
7/31/66
25,396.83
7/31/67
25,700.70
7/31/68
25,545.51
7/31/69
23,391.39
4/71
53,500.00
5. The financial records before the Court disclose the following information regarding the profitability of the Mall Pharmacy: Profit or (Loss)
Net Profit or
Retained Earnings Period Ending
from Operations
(Loss) for Period
(Deficit)
4/30/64
(7 months)
($21,273.98)
($21,740.21)
($21,740.21)
7/31/64
(10 months)
($30,879.14)
($31,991.18)
($31,991.18)
7/31/65
$ 1,868.86
($ 1,920.35)
($33,911.53)
7/31/66
$27,600.13
$23,154.56
($10,756.97)
7/31/67
$23,532.32
$15,062.19
($ 694.78) It has been stipulated that the Pharmacy received a $2,000 advance from Richard B. Thaler sometime between January 23, 1964 and July 30, 1965, but on an unspecified date. With the exception of the note dated November 6, 1964, which was payable on demand after 3 months, all the notes were demand notes.
*
7/31/68
($ 641.21)
($ 3,743.06)
($ 4,437.84)
7/31/69
($10,409.85)
($12,669.52)
($17,107.36)
* A $5,000 dividend was declared during the fiscal year ending July 31, 1967.↩
6. It has been suggested that the debt-equity issue is not merely a question of fact. See Austin Village, Inc. v. United States,432 F.2d 741 (6th Cir. 1970); Gilbert v. Commissioner,248 F.2d 399, 408-09↩ (2d Cir. 1957) (concurring opinion of Judge Waterman), remanding a Memorandum Opinion of this Court. 7. The fact that the advances were formally characterized as debts by the Pharmacy is some evidence of their character, but it is not decisive. See Motel Corp. v. Commissioner,54 T.C. 1433, 1436 (1970). There are at least 16 separate determining factors generally used by the courts in determining whether amounts advanced to a corporation constitute equity capital or indebtedness. They are: (1) the intent of the parties; (2) the identity between creditors and shareholders; (3) the extent of participation in management by the holder of the instrument; (4) the ability of the corporation to obtain funds from outside sources; (5) the "thinness" of the capital structure in relation to debt; (6) the risk involved; (7) the formal indicia of the arrangement; (8) the relative position of the obligees as to other creditors regarding the payment of interest and principal; (9) the voting power of the holder of the instrument; (10) the provisions of a fixed rate of interest; (11) a contingency on the obligation to repay; (12) the source of the interest payments; (13) the presence or absence of a fixed maturity date; (14) a provision for redemption by the corporation; (15) a provision for redemption at the option of the holder; and (16) the timing of the advance with reference to the organization of the corporation. Fin Hay Realty Co. v. United States, 398 F. 2d 694, 696 (3d Cir. 1968); see also Montclair, Inc. v. Commissioner,318 F. 2d 38, 40↩ (5th Cir. 1963), affg. a Memorandum Opinion of this Court.
8. The record is not clear whether interest was in fact paid by the Pharmacy to petitioners. However, in light of those factors strongly indicating equity, the fact of payment or nonpayment of interest on the demand notes is not determinative.↩
9. SEC. 166. BAD DEBTS. * * *
(d) NONBUSINESS DEBTS.-- (1) GENERAL RULE.--In the case of a taxpayer other than a corporation-- (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. (2) NONBUSINESS DEBT DEFINED.--For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than-- (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.↩