Joseph L. **FISCHER** and Elaine Fischer, Plaintiffs,

v.

**UNITED STATES of America,**
**Defendant.**

**Civ. A. No. 74–900.**

United States District Court, E. D. Pennsylvania.

Sept. 16, 1977.

**34**

Peter Baughman, Jenkintown, Pa., for plaintiffs.

J. Brian Ferrel, Tax Div., Dept. of Justice, Washington, D. C., for defendant.

## OPINION

DITTER, District Judge.

The question presented in this case is whether certain advances to a closely held corporation were loans or contributions to capital, and, if loans, whether they should be treated as business or nonbusiness debts for federal income tax purposes. Plaintiff asserts that these advances were business bad debts and seeks a tax refund for the years 1967 through 1969 as well as the right to apply the remainder of the claimed deduction against his income for the years 1971 through 1975. Cross-motions for summary judgment are now before the court. I conclude the advances were contributions to capital and, therefore, grant the government's motion.

### I. *The Factual Background*[1]

On October 31, 1962, the plaintiff, Joseph L. Fischer,[2] purchased 50 percent of the common stock of Yank Chevrolet, Inc. (Yank), an automobile dealership then located in Vineland, New Jersey, for $15,000. Thereafter, plaintiff became Yank's general manager and executive vice-president. On January 21, 1964, Fischer acquired 50 percent of Yank's preferred stock for $17,500. The remaining 50 percent interest in Yank was held by its president, Arnold Yank. As of October, 1962, the business had had a history of financial losses and continued to suffer severe setbacks in the next few years, leaving the dealership with a net worth deficit of $312,132 at the close of 1966. To keep the business from closing, plaintiff, beginning in February, 1965, obtained funds from a number of third parties which were either paid directly to Yank or transferred to Yank through plaintiff. Between February 8, 1965, and August 1, 1966, Dr. Joseph Brenner, plaintiff's father-in-law, issued four separate checks totalling $37,000. and made payable to Yank. In return, Mr. and Mrs. Fischer issued a promissory note to Dr. Brenner.[3]

Thereafter, in late 1966, plaintiff was approached by the Ford Motor Company and offered the position of general manager for a new dealership to be known as Presidential Ford, Inc. (Presidential). He signed a management contract with Presidential on June 1, 1967, which provided him with a $36,000. per year salary, 25 percent of the dealership's net profits, excluding rent expense, and a five-year option to purchase the assets of the dealership. Three days prior to the formalization of the agreement with Presidential, Mr. and Mrs. Fischer borrowed $40,000. from Continental Bank and

---

1. Most of the relevant facts were stipulated to by the parties in their joint Pre-Trial Order, filed December 21, 1976. Since what transpired is complex, I shall attempt, for the sake of simplicity, to lay out the details in chronological order.

2. Elaine Fischer, wife of Joseph L. Fischer, is a named plaintiff because joint income tax returns were filed by Mr. and Mrs. Fischer for the tax years in question. Hereafter, I shall refer to plaintiffs as "Fischer" or "taxpayer" and in the singular.

3. In fact, three notes were issued by the Fischers to Brenner, all of which are on different forms and have different terms. Two of them are dated August 1, 1966, while the other is dated August 5, 1966; two notes, with differing dates, are in the amount of $37,500. Defendant's Exhibits C(1) and C(3). Just which one of these evidences the purported indebtedness is a matter of pure speculation. A portion of this amount was repaid to Dr. Brenner, either $14,000. (see Plaintiff's Answers to Defendant's Second Set of Interrogatories, No. 31) or $15,000., by checks issued by Yank to Joseph Fischer who in turn endorsed each check over to Brenner. See Pretrial Order, Stipulation of Facts (Stip.Fact), C(4)(c).

the money was turned over to Yank on May 31, 1967. Of this amount, $6,959. was repaid by Yank, leaving a balance of $33,041. at the end of 1969.[4] On August 3, 1967, Fischer received $12,500. from Martin Coopersmith, and passed it on to Yank;[5] at least $2,500. of this amount was subsequently repaid by Yank. The next advance occurred in December, 1967, when Dr. Glen F. Ulansey, a cousin, forwarded $62,500. in the form of six checks to plaintiff. Five months thereafter, Harry K. Cohen, a former employer of plaintiff, advanced $125,000. by twelve checks.[6] Both individuals received an interest in plaintiff's option to buy Presidential[7] under agreements reached between them and Fischer, which evidenced an obligation to repay in six month instalments over a five-year period with interest at the rate of approximately seven percent. See Stip.Fact C(7)–C(10); Defendant's Exhibit G; Deposition of Joseph L. Fischer, dated January 29, 1975, p. 17. These amounts were transferred to Yank and two payments of principal plus interest were funneled to each through Fischer.[8] Yank subsequently was placed in receivership and the assets sold, the gross proceeds of which were distributed by order of the New Jersey Superior Court, leaving an amount in excess of $210,000. advanced by or through plaintiff still unreturned.[9]

On November 22, 1971, Mr. and Mrs. Fischer filed joint federal income tax returns for the calendar years 1967, 1968, 1969, and 1970. Amended returns were filed on December 30, 1971, in which the Fischers claimed a business bad debt deduction for 1970, based on the moneys advanced to Yank by plaintiff less the amount received from Yank. Defendant refused to grant plaintiff's requested treatment and on April 5, 1974, this action commenced.

■ In order for a summary judgment motion to be granted the movant must show two things: (1) there is no genuine issue as to any material fact and (2) he is entitled to judgment as a matter of law. Fed.R.Civ.Proc. 56(c); see generally 6 *Moore's Federal Practice* §§ 56.09–56.23 (1974). It is clear that plaintiff may not rely on the conclusory allegations in his complaint, but must submit sufficient evidence to demonstrate that there is a genuine issue as to a material fact. *Kirkland v. National Broadcasting Co., Inc.,* 425 F.Supp. 1111, 1114 (E.D.Pa.1976). I find no factual-

4. Proceeds of the sale of plaintiff's residence were applied to this loan, and the unpaid balance of $15,000. was charged off as uncollectible by Continental Bank on March 17, 1971. Defendant's Memorandum in Support of Cross Motion for Summary Judgement, p. 7; Deposition of Paul R. Pidgeon, p. 11.

5. Mr. Coopersmith gave this money to plaintiff as payment for business generated by Fischer while in the employ of Mr. Coopersmith. It should also be noted that plaintiff advanced $25,813.33 to Yank sometime between 1962 and 1966, and this was repaid in full.

6. Plaintiff's principal argument is that he was required to advance these funds to Yank to keep it an on-going enterprise, because he believed that his job at Presidential was predicated on his reputation and the apparent success of Yank. If Yank's true financial picture had been revealed, he contends, he would have lost his employment with Presidential. However, it must be noted that the management agreement between plaintiff and Yank provided that Fischer was to

". . . devote his energies exclusively to the business and affairs of Dealership and not engage in any other business or calling, whether or not the same shall compete with *Dealership, and will not,* except upon written approval of the Board of Directors of Dealership, *directly or indirectly become or remain interested, financially or otherwise, in any enterprise which shall be in competition with Dealership* " (emphasis added).
Defendant's Exhibit I, p. 1.

7. *Mr. Cohen's interest in plaintiff's option was actually given to Mr. Cohen's daughter, Francis Hess, under the terms of the agreement.*

8. The fact that certain of these advances were "repaid" by Yank, see also notes 4 and 5 and accompanying texts, does not make them— much less the "unrepaid" advances—debts.

9. This amount has been reduced to $212,000. Just how the parties arrived at this figure is a matter of mystery: Stip.Fact H(6) declares that plaintiff advanced $303,331.80 and received back $90,100.57 for a result of $213,231.31 while plaintiff, in his supporting memorandum, claims he borrowed $277,500. and was repaid approximately $65,000., thus resulting in a balance of $212,000. In any case, I shall treat the claimed deduction as $212,000.

ly disputed issues which are material and accordingly resolve the instant motions solely on the questions of law.

## II. Introduction

Section 166(a) of the Internal Revenue Code (Code), 26 U.S.C. § 166(a), provides that, in computing taxable income, a taxpayer may take a deduction for any debt owed to him that becomes worthless (bad debt) within the taxable year. The starting point for any consideration of this deduction is whether the investment in question was a debt or not. "A bona fide debt is a debt which arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money. A gift or contribution to capital shall not be considered a debt for purposes of section 166." Treas.Reg. § 1.166–1(c). Although plaintiff does not address this question, it must be the initial inquiry.

 In this regard, Section 385 of the Code sets forth a number of criteria that the Secretary of the Treasury may apply in determining whether any advance is to be considered within a debtor-creditor relationship or a corporation-shareholder relationship.[10] Interestingly enough, the Secretary has yet to prescribe regulations under this section, although it was originally enacted on December 30, 1969. Consequently, exactly which standard to apply has been of some difficulty and, as I pointed out in *Scriptomatic, Inc. v. United States,* 397 F.Supp. 753 (E.D.Pa.1975), aff'd 555 F.2d 364 (3d Cir. 1977), the "result has been a plethora of ambiguous and contradictory opinions." *Id.* at 758. For instance, a list of sixteen factors was identified by the

Third Circuit in *Fin Hay Realty Company v. United States,* 398 F.2d 694, 696 (3d Cir. 1968), but where not all the criteria are pertinent, an analysis of a lesser number will suffice. *Joseph Lupowitz Sons, Inc. v. Commissioner of Internal Revenue,* 497 F.2d 862, 865–66 (3d Cir. 1974); *Trans-Atlantic Co. v. Commissioner of Internal Revenue,* 469 F.2d 1189, 1192–93 (3d Cir. 1972).[11] However, as Judge Freedman pointed out in *Fin Hay,* no single criterion or group of criteria is decisive in this determination and the factors should only be used as aids in analyzing the realities of the transaction, i. e., whether it is actually a contribution to capital or a true loan. 398 F.2d at 697. In any case, the burden is on the taxpayer to demonstrate that the advances were indeed indebtedness. *P.M. Finance Corp. v. Commissioner of Internal Revenue,* 302 F.2d 786, 789 (3d Cir. 1962).

## III. Debt or Equity

 Three primary facets of the advances must be considered in determining whether debt or equity was created: (1) the form of the instruments; (2) the intent of the parties, and (3) the objective economic reality as it relates to the risks taken by investors. This analysis can only lead to the conclusion that the advances here were capital contributions.

### A. Form

 First and foremost in this case is the absence of a written document which would create in taxpayer an unconditional right to demand payment. There are no papers or other formal indicia evidencing the arrangement, with the possible exception of a February 7, 1967, note from Yank to Fisch-

---

10. Among the factors which may be applied are:

 (1) whether there is a written unconditional promise to pay on demand or on a specified date a sum certain in money in return for an adequate consideration in money or money's worth and to pay a fixed rate of interest;
 (2) whether there is subordination to or preference over any indebtedness of the corporation;

(3) the ratio of debt to equity of the corporation;
(4) whether there is convertibility into the stock of the corporation; and
(5) the relationship between holdings of stock and holdings of the interest in question.

11. See also *In re Uneco, Inc.,* 532 F.2d 1204,

er.[12] See *Fin Hay,* supra (criteria 7); *Lupowitz,* supra (criteria e). Thus, there was no provision for interest, no enforceable obligation on Yank's part to repay the funds advanced, no maturity date, no provision for prepayment by the corporation, *Fin Hay,* supra (criteria 10, 13, and 14); *Lupowitz,* supra (criteria b, f and g), and no provision for superiority of lien on Yank's assets.[13] The absence of an unconditional right to demand payment is practically conclusive that an advance is an equity investment. *Scriptomatic,* supra, 397 F.Supp. at 759; Plumb, *The Federal Income Tax Significance of Corporate Debt: A Critical Analysis and a Proposal,* 26 Tax L.Rev. 369, 413 (1971).

### B. Intent

 Normally, in a corporation which has a number of shareholders, parties will deal at arm's-length and the form of the resulting transaction will mirror its substance. But where a closely-held corporation is involved and the same persons sit at both sides of the bargaining table, form will not always correspond to the nature of the transaction, for the parties may create whatever appearance may be of tax benefit to them despite the economic reality of the advance. "This is particularly so where a shareholder can have the funds he advances to a corporation treated as corporate obligations instead of contributions to capital

without affecting his proportionate equity interest." *Fin Hay,* supra, 398 F.2d at 697. Thus, conclusory declarations that the parties intended to create debts should carry little weight. Neither can the court read the parties' minds; rather, intent can only be ascertained from objective factors. In considering all of the objective factors, I can draw only one inference: these advances were intended to be equity investments.

First, it is clear from the previous discussion that the parties failed to follow any formality with regard to the advances. There was no corporate action authorizing the "borrowing," [14] taxpayer did not take any security as a result of his advances, and there was no provision made for a sinking fund or corporate reserve to effect repayment. Second, persuasive evidence of an initial intention to repay purported debt is the fact that all payments are actually met on time. *Harlan v. United States,* 409 F.2d 904, 909 (5th Cir. 1969); *Plumb,* supra at 490–91. Here, if the parties did intend taxpayer's advances to be debt and did intend to abide by the same conditions afforded taxpayer's lenders, then it is evident that such payments were not effected timely. In fact, only four payments totalling $37,500. in principal were ever made to taxpayer to allow him to repay the advances of Dr. Ulansey and Mr. Cohen. In short, Fischer failed to act like a creditor. See *Wood*

---

1208 (8th Cir. 1976); *In re Indian Lake Estates, Inc.,* 448 F.2d 574, 578–579 (5th Cir. 1971).

**12.** This was a demand note for $50,000., payable in six months, which did not provide for any interest payments. However, I concur with the government's position that this note should not be considered since it bore no reasonable relationship at the time it was executed to any advances that had been made by plaintiff to Yank.

**13.** One of the indicia of a debt instrument is provision for a lien on corporate assets. Conversely, where by agreement an advance is subordinate to other payments to the company, or where there is no agreement at all, a payment to capital may be indicated. See *Tomlinson v. 1661 Corporation,* 377 F.2d 291, 298 (5th Cir. 1967). Here, plaintiff testified he and Arnold Yank had an informal agreement that there was to be no subordination with regard to

plaintiff's advances. Plaintiff related that the terms of repayment by Yank to him would be the same as his terms for repayment with Continental Bank, Dr. Ulansey, and Harry Cohen. See Deposition of Joseph L. Fischer, dated January 29, 1975, at p. 20. That would not be enough, however, to have any legal effect. In the absence of provision for notice, such an arrangement would not enhance plaintiff's position vis-a-vis others who provided funds, goods, or services. Again, the absence of any formal written instrument containing terms associated with debt instruments, such as the creation of a lien, is consistent with contributions to capital.

**14.** But cf. *Ray v. United States,* 68–1 U.S.T.C. ¶ 9152 (M.D.Tenn.1967), where the court held that such authorization is a pure formality and is unnecessary in a closely-held corporation.

*Preserving Corp. of Baltimore v. United States,* 347 F.2d 117, 119 (4th Cir. 1965). Instead, by tolerating prolonged defaults in the payment of principal, he evidenced an attitude of placing his shareholder interests ahead of his creditor interests in order to advance the needs of the corporation. I conclude that since the parties treated these advances as equity investments are normally treated, I must consider them to be equity.

## C. Economic Reality

The final consideration is the economic reality of the transactions. "Since Congress has chosen to give different tax consequences to debt and to stock, it 'would do violence to the congressional policy' to treat as debt a purported loan that 'is so risky that it can properly be regarded only as venture capital.'" *Plumb,* supra at 503, quoting *Gilbert v. Commissioner of Internal Revenue,* 248 F.2d 399, 407 (2d Cir. 1957). Several tests have been utilized as aids in this analysis.

### 1. The Debt-Equity Ratio Test

■ One of the criteria mentioned in *Fin Hay* and *Lupowitz* and now given express significance by Congress in Section 385 of the Code, see note 10, supra, is the "thinness" of the corporation's capital structure in relation to its debt. In *Lupowitz,* 497 F.2d at 866, the court cited with approval *Tyler v. Tomlinson,* 414 F.2d 884, 848 (5th Cir. 1969), wherein it was held that:

"thin capitalization is very strong evidence" of a capital contribution where: "(1) the debt to equity ratio was high to start with, (2) the parties understood that it would likely go higher, and (3) substantial portions of these funds were used for the purchase of capital assets and for meeting expenses needed to commence operations." *United States v. Henderson,* 375 F.2d 36, 40 (5th Cir. 1967).

In *Tyler,* the pre-advance debt to equity ratio was 7 to 1, with the advances raising the ratio to 10 to 1. In *Fin Hay,* the court approved a reclassification from debt to equity where the figure approximated 10 to 1, while *Lupowitz* involved a ratio exceeding 400 to 1.

Here, Yank's capitalization in 1965, when Fischer began to make these advances was $110,000., while its debt approximated $692,000.,[15] a ratio of more than six to one. If plaintiff's advances were to be considered loans, this ratio surely rose to at least nine to one by 1968, when plaintiff was transferring to Yank those funds loaned to him by Dr. Ulansey and Mr. Cohen. Since the Supreme Court has yet to formulate any rule of thumb in this area, strict adherence to any set ratio would be undesirable,[16] but judging by the *Fin Hay* and *Tyler* standards, Yank's ratio of debt to equity was excessive.

### 2. Independent Creditor Test

■ The acid test of the economic reality of a purported debt is whether an unrelated outside party would have advanced funds under like circumstances. This test affords an objective measure of all the criteria previously addressed and is consistent with the general principle that:

. . . non-arm's-length loans by a stockholder to a corporation are to be recognized or disregarded for tax purposes according to the extent to which they comply with arm's-length standards, not the extent to which the taxpayer has a business purpose. *Nassau Lens Co. v. Commissioner of Internal Revenue,* 308 F.2d 39, 46 (2d Cir. 1962).

This test is not easy to apply, since different creditors take different risks and shareholders should not be expected to be as demanding as bankers and other experienced lenders; rather, the question should be whether "no responsible banker or busi-

---

**15.** See Government's Exhibit B, in particular Schedule L, lines 20 and 14–18.

**16.** For instance, a ratio in *Berkowitz v. United States,* 411 F.2d 818, 819 (5th Cir. 1969), of 21 to 1 was described as "thin to the point of

being transparent," while a ratio of 17–1 was "well within limits courts have accepted" in *Liflans Corp. v. United States,* 390 F.2d 965, 970, 182 Ct.Cl. 825 (1968).

nessman" would have made such a loan, *Wood Preserving Corp. of Baltimore,* supra, 347 F.2d at 119; *Plumb,* supra at 531, or, in sum, "the shareholder's advance is far more speculative than what an outsider would make." *Scriptomatic,* supra, 555 F.2d at 367, quoting *Fin Hay,* supra, 398 F.2d at 697.

Under the circumstances of this case, I fail to see how any reasonably knowledgeable investor would have loaned Yank as much money, if any money at all, as the taxpayer contends he did here. A quick examination of Yank's financial situation would disclose that the corporation had been losing money at a continually increasing rate since 1959.[17] Little collateral could be offered in the way of security—Yank leased its facilities and possessed furniture and fixtures only in the amount of $65,000.[18] Thus, it would be highly improbable that a prudent businessman would have even considered Yank for a possible loan.

### 3. *Source of Payments*

▮ Another criterion that can be applied in determining whether repayment of the advances could reasonably have been expected is the projection of sources from which repayment could have been expected. In general, there are four possible sources: (1) liquidation of the business' assets, (2) profits, (3) cash flow, and (4) refinancing with another lender. "If repayment of the advances can only be reasonably assured by the chance of profits or from the liquidation

of the business, the money is at the risk of the venture." *Scriptomatic,* supra, 397 F.Supp. at 764; *Plumb,* supra at 526. If, however, under the circumstances at the time of the advances, a prudent investor would have had a realistic and reasonable expectation of an adequate cash flow or the presence of outside financing which would enable repayment to be made under the terms of the advance, economic reality would dictate that a valid debt had been created. *Plumb,* supra at 528–529. The burden is on the taxpayer to establish this, of course, and such a conclusion must be based on concrete facts and sound assumptions about the corporation's future. Here, plaintiff has failed to meet this burden for, as the previous discussion indicates, it would be neither reasonable nor realistic to expect Yank's cash flow to be sufficient to cover plaintiff's advances or that any outside lender would provide the funds to pay off the obligations.

Under all of these tests,[19] the objective factors lead to the inescapable conclusion that Fischer's advances were not made with a reasonable expectation of repayment regardless of the success of the venture but more upon the risk of the enterprise.

### 4. *Conclusion*

▮ In summary, plaintiff has failed to establish that his advances created a legally enforceable debtor-creditor relationship. The total lack of any formality is fatal, for

---

**17.** Plaintiff himself admits that Yank was anything but a profitable venture, stating that Yank was "hopelessly insolvent." See Plaintiff's Brief in Support of its Motion for Summary Judgment, pp. 3, 10.

**18.** See Government's Memorandum in Support of Summary Judgment, p. 15.

**19.** One other test that could be applied is the "core assets" test. "Core assets" are those which are essential to the corporation's operations—such things as its buildings, machinery, patents, etc. But these assets do not include working capital, that is, those amounts necessary for the financing of such things as inventory, accounts receivable and payroll. Under the somewhat traditional view, a corporation's equity should be sufficient to purchase its core

assets. See Caplin, *The Caloric Count of a Thin Corporation,* 17 N.Y.U.Instit.Fed.Tax 771, 820 (1959). Any funds used to purchase such assets may be considered at the risk of the venture, but monies used to purchase more liquid assets or for working capital may be treated as debt. I decline to follow any hard and fast rule and do not do so in this case. As I held in *Scriptomatic,* supra, 397 F.Supp. at 763, "[t]o suggest that advances from the stockholders . . . must be treated as debt because there was sufficient capital to pay for its essential assets does not represent reality." There are many instances where working capital is just as crucial, if not more, to the existence of an entity as funds used to purchase core assets, such as in labor or service oriented businesses.

it is impossible to conclude that these obligations had a maturity date and any provision for interest and repayment. The fact that no security was taken for the funds and that Fischer permitted prolonged defaults in the repayment of principal are objective factors which negative any intent that the advances be treated as debt. Furthermore, the economic reality of the transactions points to the conclusion that repayment was contingent upon the success of Yank. For these reasons, I conclude that no decision could be reached except that these advances were investments in equity. Accordingly, the government's motion for summary judgment must be granted and plaintiff's motion denied.[20]

---

**20.** Because I have decided that these advances must be treated as equity investments, it is not necessary to consider whether the advances were business or nonbusiness bad debts, which are accorded different tax treatment. See 26 U.S.C. §§ 166(d)(1)(B), 172(b)(1)(A)(i), and 172(d)(4).