PAUL L. DUNMIRE AND ESTHER DUNMIRE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Dunmire v. Commissioner
Docket No. 9972-79.
United States Tax Court
T.C. Memo 1981-372; 1981 Tax Ct. Memo LEXIS 373; 42 T.C.M. (CCH) 438; T.C.M. (RIA) 81372; July 20, 1981. Michael E. Hoover, for the petitioners. Edward F. Peduzzi, Jr., for the respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: Respondent determined a deficiency in petitioners' Federal income tax for the calendar year 1976 in the amount of $ 7,225. At issue are (1) whether advances made by petitioners to Euwer's, Inc., a family-owned corporation, constitute debt within the meaning of section 166; [1] and, if not, (2) whether the advances constitute trade or business expenses deductible under section 162. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. [2]
Petitioners [3] resided in Kittanning, Pennsylvania, at the time that they filed their petition in htis case. They filed their joint Federal *375 income tax return for the calendar year 1976 with the Internal Revenue Service Center at Philadelphia, Pennsylvania. On that return they claimed a deduction for a business bad debt in the amount of $ 100,223, which respondent disallowed in his notice of deficiency. Petitioners disputed that disallowance and petitioned this Court for a redetermination. At all times relevant to this case petitioner had an ownership interest in Euwer's, Inc. of New Kensington ("Euwer's"), a Pennsylvania corporation engaged in the retail sale of furniture. [4] Petitioner did not involve himself in the day-to-day activities of this business but rather left such matters to a salaried manager. Petitioner did, however, consult with the manager (principally by telephone) on a periodic basis and did generally reserve policy decisions for his final say. He did not, however, *376 draw any salary. [5]
No later than 1970 Euwer's had become an unprofitable business. On its income tax returns for 1970 through 1976 it reported the following losses: 1970
$ 5,860.34
1971
661.00
1972
4,180.32
1973
8,714.77
1974
15,376.00
1975
30,677.00
1976
56,027.00
By December 31, 1975, Euwer's had become insolvent. Its trial balance for that date, as determined by its accountant, disclosed total assets of $ 145,785 and total liabilities (exclusive of shareholder loans and equity) of $ 282,004. Current liabilities exceeded *377 current assets by approximately $ 155,000. The working capital and acid test ratios, financial barometers of the state of health of a business, reflected extremely poor condition. [6] Moreover, Euwer's was out of trust by approximately $ 40,000 in respect of its inventory floor plan security agreement with its lender, People's Bank of Ford City. In addition, it had become delinquent in the payment of its payroll taxes. Euwer's financial condition was perceived as hopeless. [7] Accordingly, sometime late in 1975 or early in 1976 petitioner discussed with his accountant the prospect of terminating the corporate existence of Euwer's either through bankruptcy or by liquidation and dissolution. Petitioner rejected the possibility of bankruptcy and opted instead to liquidate and dissolve the corporation. He elected this course for a variety of personal, investment, and business reasons; however, he was primarily motivated by his personal dislike of the bankruptcy *378 process and by his desire to protect his investment portfolio and his investment income. He decided to advance funds sufficient to satisfy the corporation's past due obligations and then to quietly liquidate and dissolve it. Accordingly, from February through December 1976 petitioner advanced to Euwer's a total of $ 100,223.09. Of this amount $ 30,500.54 was advanced in twenty-six installments of varying size; [8] $ 25,350.33 was advanced directly to a variety of nonbank creditors, principally supplies; $ 390.49 was advanced in order to cover two voided payroll checks; [9] and $ 43,980.73 was advanced to People's Bank in order to put Euwer's back in trust in respect ot its inventory floor plan loan with that financial institution. *379 Euwer's did not execute a promissory note or other memorial, nor did it enter into any formal memorandum of agreement, with respect to the advances. They were, however, recorded as liabilities on its ledger. Nevertheless, petitioner did not harbor any expectation of repayment. On March 31, 1977, Euwer's formally liquidated and dissolved. At that time assets in the amount of $ 133,953.98 and liabilities (exclusive of any advances) of $ 170,392.98 were distributed to petitioner. Throughout the remainder of that year he operated Euwer's as a sole proprietor. [10]
In addition to his interest in Euwer's, petitioner had (at all times relevant to this case) interests in a variety of other family-owned, [11] nonbank businesses. Those interests were as follows: Petitioner's
Organizational
Nature of
Individual
Name
Form
Business
Interest
Veech's
Proprietorship
Retail Furniture
100%
West Kittanning
Corporation
Lumberyard
30%
Lumber-Kittanning
West Kittanning
Corporation
Lumberyard
30%
Lumber-Butler
McConnell &
Corporation
Retail Hardware
75%
Waterson
Kittanning
Partnership
Wholesale Hardware
50%
Wholesale Supply
Apollo
Corporation
Retail Lawn &
25%
Milling Co.
(Sub S)
Garden Supplies
Dunmire Co.
Corporation
Tack Shop
1%
Jeppco
Corporation
Real Estate
25%
Management
*380 The extent of petitioner's involvement with these businesses varied. He admitted that he had "very limited contact" with Apollo Milling Co. and the Dunmire Company, and that one of his sons operated West Kittanning Lumber-Kittanning. The remaining businesses were operated by salaried managers who were responsible for the day-to-day affairs. As with Euwer's, petitioner did periodically consult with his managers and generally maintained the last word in policymaking. He did not, however, draw any salary from any of the businesses. On his returns he reported his net profit or loss from Veech's, his distributive share of partnership income or loss from Kittanning Wholesale Supply, and his share of undistributed taxable income from Apollo Milling Co. [12]
In addition to his interests in all of the foregoing businesses, petitioner had (at all times relevant *381 to this case) an interest in each of the following banks: Overall
1976
1976 Value
Petitioner's
Dunmire
Total
(Book or
Individual
Family
Outstanding
Market)
Bank
Interest
Interest
Shares
Per Share
People's Bank
42%
54.25%
* 600
* $ 818 (mkt)
of Ford City
Armstrong
County
15.18%
35%
8,000
225 (bk) Trust Co.
Merchant's Nat.
Bank
21.75 %
46%
2,000
1,068 (bk) Farmer's Nat.
Bank
10.1%
46%
1,000
2,546 (bk) Elderton
State Bank
Unknown
18%
700
2,546 (bk) New Bethelehem
Bank
14 Shares **
4,500
1,221 (bk) National Bank
of
De minimis
De Minimis
Unknown
23 (mkt)
the Commonwealth
Northwestern
Pa.
De minimis
De minimis
Unknown
37 (mkt)
Bank & Trust
Co.
Petitioner was a member of the board of directors of all of the above banks, [13] except for the last two, and was on the board's executive committee of People's, Merchant's, and New Bethlehem. His degree of activity as a board member varied. He was active on a daily basis in the affairs of People's, Merchant's, *382 and New Bethlehem, but was largely inactive in the affairs of the others except for attending the monthly or semimonthly board meetings. As a board member petitioner actively participated in formulating each bank's dividend policy. He continually pressed for greater dividends and, given his status and stock ownership, was generally successful in persuading other board members to adopt his views. Petitioner's bank stock dividends increased from 1972 to 1976 as follows: 1972
1973
1974
1975
1976
Bank stock
[14] dividends $ 43,549
$ 49,666
$ 63,110
$ 68,786
$ 107,631
These increases were due to petitioner's influence on dividend policy rather than any increase in stock ownership. The dramatic increase from 1975 to 1976 was occasioned by petitioner's efforts to raise capital to advance to Euwer's. Petitioner also derived fees from the banks in his capacity as a director. Such fees *383 from 1972 through 1976 were as follows: 1972
1973
1974
1975
1976
Bank director
[15] fees $ 22,635
$ 23,675
$ 28,359
$ 31,985
$ 26,048
In addition, petitioner derived wages during this period in the approximate amount of $ 7,500 per year from People's Bank. The record does not disclose the nature of the services rendered. As of 1976 petitioner (and/or Esther Dunmire) was the maker of outstanding demand notes well in excess of $ 1,000,000. [16] These notes were secured by pledges of his bank stock. Additional bank stock was pledged as security in respect of the floor plan loan and other loans between Euwer's and People's bank. Together these pledges constituted substantially all of petitioner's bank stock portfolio. *384 Petitioner was not personally liable as either a maker or a guarantor in respect of any loan between Euwer's and People's or in respect of any extension of credit to Euwer's. ULTIMATE FINDINGS OF FACT 1. Petitioner's advances to Euwer's during 1976 did not constitute debt. 2. Petitioner did not make the advances in pursuit of a trade or business but rather to protect his position as an investor. OPINION We must first decide whether advances made by petitioner during 1976 to Euwer's constitute debt. If so, we must then decide whether the debt "became wortheless" during that year. As might be expected, petitioners contend that the advances constitute debt which became worthless during 1976. [17] On the other hand, respondent contends that the advances do not constitute debt and, in the alternative, that the "debt" did not become wortheless during 1976. [18]
*385 Section 166(a) [19] allows a deduction for debts which become wortheless during the taxable year. However, only a bona fide debt qualifies for purposes of section 166. Section 1.166-1(c), Income Tax Regs. Under the regulation a bona fide debt is a debt which arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money. A gift or contribution to capital is not considered a debt for purposes of section 166. The characterization of advances to a corporation by a shareholder is a question of fact to be determined from all of the facts and circumstances with the burden on the taxpayer to establish that the advances were loans. Gilbert v. Commissioner, 262 F.2d 512, 513 (2d Cir. 1959), cert. denied 359 U.S. 1002 (1959); P.M. Finance Corp. v. Commissioner, 302 F.2d 786, 789 (3d Cir. 1962); Yale Avenue Corp. v. Commissioner, 58 T.C. 1062, 1973 (1972). *386 Many cases have attempted to define standards in order to resolve the debt-equity issue. [20] The following sixteen standards were set forth in Fin Hay Realty Co. v. United States, 398 F.2d 694, 696 (3d Cir. 1968): (1) the intent of the parties; (2) the identity between creditors and shareholders; (3) the extent of participation in management by the holder of the instrument; (4) the ability of the corporation to obtain funds from outside sources; (5) the "thinness" of the capital structure in relation to debt; (6) the risk involved; (7) the formal indicia of the arrangement; (8) the relative position of the obligees as to other creditors regarding the payment of interest and principal; (9) the voting power of the holder of the instrument; (10) the provision of a fixed rate of interest; (11) a contingency on the obligation to repay; (12) the source of the interest payments; (13) the presence or absence of a fixed maturity date; (14) a provision for redemption by the corporation; (15) a provision for redemption at the option of the holder; and (16) the timing of the advance with reference to the organization of the corporation. However, as the Court of Appeals pointed *387 out, no single factor or group of factors is decisive in this determination and the factors should only be used as aids in analyzing the realities of the transaction. Fin Hay Realty Co. v. United States, supra at 697. On brief the parties have emphasized the facts with respect to various factors in support of their respective positions in an efforts to resolve this issue. Our analysis of the relevant factors leads us to conclude that petitioner's advances were not loans. [21]
In reaching our conclusion we find particularly persuasive the fact that petitioner never harbored any expectation of repayment. At the times that the advances were made Euwer's was insolvent, and it had been an unprofitable business for a number of years. Its chances for improvement were perceived as nil. In the words of petitioner's accountant, Euwer's was a "dead horse and let's just get it across that finish line." After consultation with his accountant *388 petitioner determined that advances would be made in order to facilitate its liquidation and dissolution. These advances were made with knowledge that they would not be repaid and, as indicated, with no expectation of repayment. Early during the following year Euwer's was, in fact, liquidated pursuant to petitioner's plan. For purposes of section 166 "debt" not only involves a legal obligation to pay on the part of the debtor but also involves an expectation of repayment on the part of the creditor. Thus, if the purported debtor is insolvent or is otherwise incapable of paying and the purported creditor does not expect to be repaid, the advance is deemed to be a gift, a contribution to capital, or an expense, but not a debt. Reading Co. v. Commissioner, 132 F.2d 306, 310 (3d Cir. 1942), cert. denied 318 U.S. 778 (1943); Roussel v. Commissioner, 37 T.C. 235 (1961); see Eckert v. Burnet, 283 U.S. 140, 141 (1931); Casco Bank and Trust Co. v. United States, 544 F.2d 528 (1st Cir. 1976), cert denied 430 U.S. 907 (1977); cf. Funk v. Commissioner, 35 T.C. 42, 50 (1960). As *389 this Court stated in Roussel, supra at 242, "if the debtor is * * * so hopelessly insolvent as to preclude any expectation of reimbursement * * *, it is presumed that the payor is not lending the money and that no debt is created." While petitioner readily admits that he had no expectation of repayment, he nonetheless contends that he never expected to eventually realize any investment return on his advances. Suffice it to say that the burden of proof on the issue of debt is on the petitioner, Rule 142, Tax Court Rules of Practice and Procedure, and we think that he has failed to carry it. Petitioner also contends that he intended the advances to be loans. We have already discussed, however, that petitioner had no expectation of repayment.Moreover, conclusory and self-serving statements by taxpayers that they intended to create debts have been accorded little weight by the courts. Fischer v. United States, 441 F. Supp. 32, 37 (E.D. Pa. 1977), affd. by unpublished opinion (3d Cir., August 11, 1978). Where a closely held corporation is involved, form does not always correspond to the nature of a transaction because the parties can create *390 whatever appearance may be of tax benefit to them despite the economic reality of the advance. Hence we attach little weight to petitioner's statements that he intended his advances to be loans to the corporation. Diamond Bros. Co. v. Commissioner, 322 F.2d 725, 730-731 (3d Cir. 1963). Another factor to consider is the formal indicia of the arrangement which purportedly creates the debtor-creditor relationship. The advances here were recorded as liabilities on the corporation's ledger. However, no promissory note or any other type of formal memorandum or memorial was executed or entered into by petitioner and Euwer's. The record is silent whether there was even an oral understanding concerning the rate of interest (if any), a maturity date, a repayment schedule, [22] or whether either party had a right to redeem the "loan," all matters of concern to parties in a debtor-creditor relationship. Finally, the advances were made without security and without any apparent provision for the creation of a sinking fund to effect repayment.[23] The absence of such formal indicia, while not determinative in and of itself, is persuasive evidence that there was no debt. See *391 Sekulow v. Commissioner, T.C. Memo. 1980-564; Granger v. Commissioner, T.C. Memo. 1978-62, on appeal (4th Cir., April 24, 1978); cf. Fischer v. United States, supra at 39-40 ("The total lack of any formality is fatal * * *"). Yet another factor to consider is the economic substance of the purported loans. Motel Corp. v. Commissioner, 54 T.C. 1433, 1436 (1970); Zivnuska v. Commissioner, 33 T.C. 226, 235 (1959). We have already discussed the fact that petitioner never harboared any expectation of repayment.[24] Another means by which to gauge economic substance is by reference to the "independent creditor." Scriptomatic, Inc. v. United States, 555 F.2d 364, 367 (3d Cir. 1977). *392 As stated in Fischer, supra at 38, "[t]he acid test of the economic reality of a purported debt is whether an unrelated outside party would have advanced funds under like circumstances." Given the financial posture of Euwer's at the times when petitioner made the advances, we think that it is highly unlikely that a prudent lender would have loaned that corporation $ 100,223 without a fixed repayment date, without a specified rate of interest, and without any security to guarantee repayment. See Hutchins Standard Service v. Commissioner, T.C. Memo. 1981-33. It is also unlikely that a prudent lender would have loaned money to Euwer's under any condition. After all, it was already out of trust in respect of its floor plan agreement and it was insolvent. Moreover, it had not reported a profit since at least 1970. Finally, its controlling shareholder had determined that it was to be liquidated. The impossibility for a corporation to raise funds other than from shareholder advances has been construed to negate an allegation of a loan. C.M. Gooch Lumber Sales Co. v. Commissioner, 49 T.C. 649, 659 (1968), vacated and remanded per *393 stipulation 406 F.2d 290 (6th Cir. 1969); see also Joseph Lupowitz Sons, Inc. v. Commissioner, 497 F.2d 862, 866 (3d Cir. 1974), reversing a Memorandum Opinion of this Court. *394 Finally, the identity of interest between petitioner as shareholder and petitioner as purported creditor is also of consequence. At the time that he made the advances petitioner was the controlling shareholder of Euwer's. Together with Esther Dunmire he owned in excess of 99 percent of the outstanding stock; and together with Esther and his mother he owned all of the stock. Such identity of interest has been found to constitute an indicium of equity. See Post v. Commissioner, T.C. Memo. 1979-419.
Having considered the totality of all of the factors discussed above, we conclude that the advances do not constitute debt. Accordingly, we hold that petitioner is not entitled to a bad debt deduction under section 166. [25]
*395 The second issue we must decide is whether the advances constitute trade or business expenses deductible under section 162(a). [26]
Petitioner contends that the advances were primarily motivated by his desire to avoid a declaration of bankruptcy by Euwer's. He argues that such bankruptcy would have impaired his financial position through the loss of bank stocks including those which he had pledged as collateral for the inventory floor plan and other loans of Euwer's; through a loss of prestige and respect in the business community the result of which would have compromised his position as bank director; and through the loss of credit for his other, nonbank business ventures. Respondent, on the other hand, contends that the advances were not proximately related to any trade or business of petitioner and that they did not constitute ordinary and necessary expenses. Although this issue is closer than the debt issue, we have concluded, after considering *396 all of the relevant facts and circumstances, that the advances are not deductible as business expenses under section 162. [27]
During 1976 petitioner advanced $ 100,223 to Euwer's. Of this amount approximately 75 percent was advanced directly to the corporation's creditors. The balance was advanced directly to Euwer's. [28] It should be kept in mind that petitioner made the advances without any legal liability to do so. We are thus presented with the question whether one person, lacking any liability to pay, can deduct the expenses of another. In order to be deductible under section 162, a business expense must be both ordinary and necessary. Payment *397 by one taxpayer of the obligation of another is not generally considered to be ordinary and necessary. Reading Co. v. Commissioner, 132 F.2d 306, 311 (3d Cir. 1942); W.F. Young, Inc. v. Commissioner, 120 F.2d 159, 166 (1st Cir. 1941); Lohrke v. Commissioner, 48 T.C. 679, 684 (1967). Thus, in Welch v. Helvering, 290 U.S. 111, 114 (1933), the Supreme Court stated that "Men do at times pay the debts of others without legal obligation or the lighter obligation imposed by the usages of trade or by neighborly amenities, but they do not do so ordinarily." See also Deputy v. DuPont, 308 U.S. 488 (1940). An exception to the above rule has developed in those cases where a taxpayer expends funds in order to protect or promote his own established business. Cf. Metro Land Co., Inc. v. Commissioner, T.C. Memo. 1981-335. This Court has developed what is essentially a two-prong test in order to determine the applicability of the exception. Thus, we have said: we must first ascertain the purpose or motive which cause the taxpayer to pay the obligations of the other person. Once we have identified *398 that motive, we must then judge whether it is an ordinary and necessary expense of the individual's trade or business; that is, is it an appropriate expenditure for the furtherance or promotion of that trade or business? If so, the expense is deductible by the individual paying it. [Lohrke, supra at 688.] In making the advances we find that petitioner was motivated by an amalgam of personal, investment, and business considerations. On balance, however, we believe that the personal and investment motives greatly overshadowed and business ones. At trial petitioner displayed an "old fashioned" dislike of the bankruptcy process. He took obvious pride in the fact that his family has always paid its bills and that he paid his own. Although Euwer's was a separate legal entity which was operated on a day-to-day basis by a third party, petitioner identified closely enough with it to regard its bankruptcy as a personal reflection on him. Much more important, however, is the fact that petitioner made the advances in order to safeguard his investment portfolio and his investment income. Although the record does not contain a detailed net worth statement, there *399 is no question that petitioner's stockholdings, and particularly his bank stockholdings, were very significant. [29] At the time that he made the advances, petitioner had pledged bank stock as collateral for various loans to Euwer's. Nearly 300 shares of various bank stock with an aggregate 1976 (book) value of approximately $ 70,000 had been pledged as collateral to People's Bank for the inventory floor plan loan to Euwer's. Over 350 shares of various bank stock with an aggregate 1976 (book or market) value of approximately $ 90,000 had also been pledged as collateral to People's for other loans to Euwer's. Thus the possibility of a declaration of bankruptcy by Euwer's seriously imperiled the pledged bank stock. [30]
*400 Also at the time that he made the advances, petitioner had pledged other bank stock as collateral for a variety of personal loans well in excess of $ 1,000,000. The number of shares and value of this pledged stock substantially exceeded that pledged on behalf of Euwer's. At trial petitioner testified that a declaration of bankruptcy by Euwer's would also have imperiled this stock because of the possibility that the lenders, rendered nervous by witnessing the financial collapse of one of his businesses, might call his loans. [31] It is doubtful whether petitioner could have then satisfied these loans without severe financial hardship. Petitioner also testified that a declaration of bankruptcy by Euwer's *401 could have jeopardized his position as bank director. [32] While petitioner did derive, in the aggregate, handsome fees as a director (as well as a modest salary from one of the banks), the directorships were far more valuable to him as a tool by which to maximize investment income. As a board member he actively participated in formulating dividend policy and continually pressed, quite successfully, for greater dividends. For each of the six years for which a return is in evidence petitioner's stock dividends significantly exceeded all other sources of income combined. Petitioner also argues that a declaration of bankruptcy by Euwer's would have compromised the availability of credit for his various, nonbank businesses. This argument does have a logical appeal; however, it is not fully supported by the record. Thus, the record does reveal borrowing by Euwer's. However, Euwer's was to be (and was in fact) liquidated, so that a loss of credit availablity would have been of no *402 consequence to it. Each year petitioner claimed large amounts of interest expense as an itemized deduction on his Schedule A; the record, however, does not disclose the purpose for such borrowing. We think it is just as possible that this borrowing was for personal or investment purposes as for business purposes. We also note that significant deductions for interest expense were claimed on petitioner's Schedule C for Veech's. However, the record is silent concerning whether Veech's was in need of additional borrowed funds in 1976 and, if so, whether any lender would have advanced funds given its increasing losses. [33] Finally, the record is also silent concerning the extent to which any of petitioner's other businesses may have needed to borrow. Petitioner cites and relies *403 upon Lutz v. Commissioner, 282 F.2d 614 (5th Cir. 1960), reversing a Memorandum Opinion of this Court. We think Lutz is distinguishable from the present case. There the taxpayer, actively engaged in the same business (as a proprietor) as his corporation, voluntarily paid the latter's debts in order to retain his individual operating license from the Department of Agriculture and to protect the existing goodwill of his individual business.(Petitioner's individual trademarks were freely used by his corporation, which also depended on his credit worthiness.) In contrast the petitioner here advanced funds in order to preserve and protect his investments rather than a business. In view of the foregoing, we hold that petitioner was primarily motivated in making the advances to Euwer's by investment considerations rather than business ones. Under Lohrke v. Commissioner, 48 T.C. at 688, this would appear to end our inquiry. Nevertheless, we will consider whether the advances were "ordinary and necessary" in the context of petitioner's trade or business since the issue has been argued by the parties. Respondent disputes that petitioner had any *404 trade or business. Petitioner maintains that he was engaged in several trades or business, but principally that of bank director. [34] We are satisfied that petitioner was in the trade or business of being a bank director. He devoted considerable time to that activity and was very well compensated.On the other hand, we question whether petitioner was in the trade or business of retailer-wholesaler and real estate management, as he maintains, given the minimal time he devoted to the nonbank businesses and his lack of compensation. [35] See Low v. Nunan, 154 F.2d 261, 264 (2d Cir. 1946) (an officer or employee who serves without compensation is not engaged in a trade or business). It should also be kept in mind that an individual's investment activities do not constitute a trade or business. Higgins v. Commissioner, 312 U.S. 212, 218 (1941). As the Supreme Court stated in Whipple v. Commissioner, 373 U.S. 193, 202 (1963): *405 Devoting one's time and energies to the affairs of a corporation is not of itself, and without more, a trade or business of the person so engaged. Though such activities may produce income, profit or gain in the form of dividends or enhancement in the value of an investment, this return is distinctive to the process of investing and is generated by the successful operation of the corporation's business as distinguished from the trade or business of the taxpayer himself. * * * Thus, the rendering of management services cannot be considered a trade or business when done primarily to protect or enhance one's investment rather than to earn a salary. [36]French v. United States, 487 F.2d 1246, 1249 (1st Cir. 1973). *406 This leaves the question of "ordinary and necessary." We have already indirectly addressed "necessary" in our discussion concerning petitioner's motive in making the advances. As for "ordinary," the unreported case of Spears v. United States, 32 AFTR2d par. 73-5152, 73-2 USTC par. 9621 (E.D. Tex. 1973), is strikingly on point. There the taxpayer was the president and chairman of the board of a Texas bank and an active investor in a number of local business enterprises including several retail discount stores which were operated in corporate form. Through his investment activity the taxpayer had become personally indebted to a Dallas bank. A part of that indebtedness was secured by a substantial number of shares owned by the taxpayer in the bank in which he was involved. The taxpayer's discount stores proved to be unprofitable and foundered.In order to protect his reputation and career as a banker and to preclude his personal loans from being called, the taxpayer personally paid virtually all of the outstanding liabilities of the discount stores. The taxpayer paid these liabilities voluntarily and without legal obligation. He then sought to deduct them under *407 either section 165 or 212. The Court rejected the taxpayer's theory and determined that the only possibility for his recovery lay under section 162. The Court then concluded as follows: The great majority of courts have placed the voluntary payment of a third person's debts under the aegis of section 162, and have attempted to determine whether the payment was an ordinary and necessary business expense. * * * Under section 162, the taxpayer must show not only that the expense was necessary, but also that it was ordinary. * * * As to whether the taxpayer has shown that these payments were ordinary, a more difficult question is presented. "Ordinary has the connotation of normal, usual, or customary. To be sure, an expense may be ordinary though it happen but once in the taxpayer's lifetime. Yet the transaction which gives rise to it must be of common or frequent occurrence in the type of business involved." (Italics added.) Deputy v. DuPont, 308 U.S. 488, 495 (1940). As otherwise stated, the expenditure must have some reasonably proximate relation to the customary conduct of the taxpayer's business. * * * For a court to find that a particular expenditure *408 is ordinary within the meaning of the Code, there must be evidence that the transaction in question has some degree of normality in the type of business under scrutiny. * * * Absent such evidence, there must be a basis for an "assumption, in experience or common knowledge, that… payments [sought to be deducted] are to be placed in the same category as typically ordinary expenses…." Deputy v. DuPont, supra, 308 U.S. at 497. The taxpayer has failed to demonstrate that the expenses incurred here are normal, usual, or customary in the field of banking. The record reveals no positive evidence as to the normal banking practice in situations such as the instant one. It would be inappropriate for the court to take judicial knowledge of banking practices, since banking is an area of experience whose perimeters are far outside the bounds of ordinary and common knowledge. [Spears, supra at 73-5521-73-5522, 82,025-82,026.] The record here is likewise silent as to whether the advances made by the petitioner are normal, usual, or customary for a bank director. As in Spears, we decline to speculate on this matter. Decision will be entered for *409 the respondent. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the year in issue, unless otherwise indicated.↩
2. In a few instances stipulated facts were contradicted by testimony at trial. We have given the testimony precedence in those instances where a party requested a finding based thereon and the other party concurred.↩
3. Esther Dunmire is a party to this action primarily by virtue of having filed a joint return with her husband Paul L. Dunmire. Because he is the principal petitioner, he will be referred to individually as the petitioner. This is consonant with the parties' stipulation that Paul L. Dunmire is the operative petitioner in this case.↩
4. The stock ownership of Euwer's was as follows: ↩
Common
Preferred
Petitioner
49.99%
57.11%
Esther Dunmire
49.99%
42.85%
Petitioner's Mother
.02%
.04%
5. On cross-examination petitioner testified that the only income that he expected to derive from Euwer's was from dividends. On redirect, however, he testified that he would have drawn a salary if Euwer's had had sufficient income. This inconsistency was also present in his testimony concerning his other nonbank business discussed infra↩. In light of all the evidence we believe that petitioner regarded these businesses more as investments.
6. The accountant testified that, at December 31, 1975, Euwer's working capital ratio was.3994:1 and its acid test ratio was.0832:1. He further testified that generally acceptable ratios were 2:1 and 1:1, respectively.↩
7. Indeed, its insolvency persisted throughout 1976 and until its liquidation and dissolution on March 31, 1977. ↩
8. Although the record does not disclose the disposition of this amount, we assume that it was expended to satisfy various liabilities of the corporation. We base our assumption on the fact that the purpose of the advances, as testified to by petitioner and his accountant, was to enable Euwer's to satisfy its past due obligations in order to facilitate its liquidation. ↩
9. The record does not disclose whether this amount was advanced directly to the employee-creditors or to Euwer's.↩
10. Judging from reported gross receipts on Schedule C of his 1977 income tax return, it would appear that petitioner was winding down the business by gradually liquidating its inventory.↩
11. Except for Veech's, petitioner shared ownership in each of the enumerated businesses with either his father, his sons, or Esther Dunmire.↩
12. Such amounts for 1972 through 1976 were as follows: ↩
1972
1973
1974
1975
1976
Veech's
$ 12,179 ($ 14,846)
($ 9,243)
($ 31,275)
($ 33,260)
Kittanning
(5,962)
6,962 (5,176)
(197)
(6,643)
Wholesale
Supply
Apollo
Milling Co.
1,349 1,505 1,604 1,717 1,028 *. Prior to 4-to-1 stock split on December 31, 1976. ** People's Bank owned 51 2/9% of the stock of New Bethlehem.↩
13. Esther Dunmire was also on the board of People's and Farmer's.↩
14. Included in bank stock dividends are small amounts of dividends from financial institutions other than those set forth above, as well as Esther Dunmire's bank stock dividends.↩
15. The totals for 1974, 1975, and 1976 include relatively small amounts of director fees reported by Esther Dunmire. The total for 1976 is net of expenses claimed by petitioner; all other totals represent gross amounts.↩
16. The record does not disclose the purpose for which these loans were made. Petitioner did claim an itemized deduction for interest expense on each of his returns for 1972 through 1976 in amounts ranging between $ 44,000 and $ 86,000. Lesser, but still substantial, amounts of interest were claimed on the Schedule C's for Veech's.↩
17. On brief petitioner argues that respondent, in the notice of deficiency, concedes that the advances constitute debt and premises the disallowance on the grounds that petitioner has not shown that the debt qualifies as a business↩ bad debt which became worthless during 1976. Both parties address this issue in their briefs with a flurry of allegations concerning what transpired during the administrative and pre-trial stages of this case. None of these allegations are supported by evidence in the record and we will not consider them. While the explanatory portion of the notice may not have been artfully drafted, we believe that petitioner construes its language too narrowly. Moreover, petitioner did not claim surprise or otherwise object when respondent discussed his theory of the case in his trial memorandum and opening statement. Finally, judging from interrogatories served by respondent, as well as the parties' stipulation of facts, we are satisfied that petitioner was aware of respondent's position. 18. On brief respondent appears to concede that the petitioner is entitled to a business↩ had debt deduction if the Court concludes that the advances constitute debt which became worthless during 1976.
19. SEC. 166. BAD DEBTS. (a) General Rule.-- (1) Wholly wortheless debts.--There shall be allowed as a deduction any debt which becomes wortheless within the taxable year.
(2) Partially wortheless debts.--When satisfied that a debt is recoverable only in part, the Secretary or his delegate may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction.↩
20. The final regulations under section 385 have not yet become effective and are not applicable to this case.↩
21. Because of this conclusion we do not reach the question whether the "debt" became wortheless during 1976.↩
22. No payment of interest or principal was ever in fact made, a matter found to be of consequence in Post v. Commissioner, T.C. Memo. 1979-419↩. 23. Although Euwer's, because of its financial plight, might not have been able to give meaningful security for the advances, it could have given a second trust or second mortgage which might have protected petitioner against the claims of unsecured creditors or subsequent lienholders.↩
24. In our opinion the petitioner's admitted intention regarding the liquidation of Euwer's adequately resolves the question of expectation of repayment. Any remaining doubt, however, can be quickly laid to rest by reference to the "thinness" of the corporation's capital structure. The ratio of debt to equity is considered a significant factor bearing on the expectation of repayment because it reflects the extent to which purported creditors are shielded against business losses and declines in property values. See Gilbert v. Commissioner, 248 F.2d 399, 407 (2d Cir. 1957). The courts have approved reclassifications of debt to equity where the debt to equity ratio has approximated 10 to 1. Fin Hay Realty Co. v. Commissioner, 398 F.2d 694, 698 (3d Cir. 1968); Fischer v. United States, 441 F.Supp. 32, 38 (E.D. Pa. 1977), affd. by unpublished opinion (3d Cir., August 11, 1978). Although the capitalization of Euwer's may have been adequate at the time of its formation, when the advances were made in 1976 the debt to equity ratio approached infinity to one because shareholders' equity was a negative quantity. Cf. Steiner v. Commissioner, T.C. Memo. 1981-212↩. Given the extreme "thinness" of the corporation's capital structure in 1976, a reclassification of petitioner's advances is similarly warranted. Interestingly enough, petitioner himself reclassified as equity net advances in the amount of $ 13,940 which he had made during prior periods and which Euwer's had historically carried on its books as debt.
25. In his reply brief, for the first time, petitioner contends that he is entitled to deduct the amount in question as guarantor pursuant to section 1.166-8(b), Income Tax Regs. Although petitioner admits that he did not per se guarantee any of the obligations of Euwer's, he argues that he was, in effect, a guarantor because of his pledges of stock. We are not inclined to consider such a theory introduced so late in these proceedings, especially where a party (respondent in this case) is denied the opportunity of even responding to it on brief. Arkin v. Commissioner, 76 T.C.     (June 25, 1981); cf. Markwardt v. Commissioner, 64 T.C. 989, 997 (1975). Nevertheless, we note that petitioner does not cite any cases or other support for his proposition that a pledge is the economic equivalent of a guarantee. In our opinion there are important differences between pledges and guarantees, most notably the personal liability (and resultant exposure of one's entire estate) that attaches to the guarantor, that would justify different tax treatment under section 166. Moreover, we note that the factual predicate for much of petitioner's argument is lacking. Thus, of the $ 100,223.09 advanced by petitioner, the record only indicates that $ 43,980.73 was paid on corporate loans in respect to which stock had been pledged. In any event an advance by a shareholder to a corporation pursuant to a guarantee of its indebtedness can constitute a contribution of capital rather than a loan. Casco Bank and Trust Co. v. United States, 544 F.2d 528, 534-535 (1st Cir. 1976). As this Court stated in Santa Anita Consolidated, Inc. v. Commissioner, 50 T.C. 536, 550 (1968): the fact that the advances were made in the form of guaranteed debt does not, in and of itself, negate their treatment as capital contributions. Whether such debt is to be treated as an indirect capital contribution must be resolved by an investigation of the facts in the light of traditional debt-equity principles. Each case, including a case involving guaranteed debt, turns on its own facts * * *.↩
26. SEC. 162. TRADE OR BUSINESS EXPENSES.
(a) In General.--There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * *↩
27. Petitioner has never contended that he is entitled to a deduction under section 212. Accordingly, we do not consider the applicability vel non of that section.See, however, Spears v. United States↩, an unreported case ( E.D. Tex. 1973, 32 AFTR2d par. 73-5152, 73-2 USTC par. 9621), which held section 212 inapplicable under facts strikingly similar to those of the present case.
28. As discussed in footnote 8, we assume that this amount was expended to satisfy various liabilities of the corporation.↩
29. The record indicates that the 1976 (book or market) value of petitioner's individual interest in bank stocks which he directly owned exceeded $ 1,000,000. None of his six returns which were admitted into evidence suggests the ownership of any other asset or group of assets even remotely as valuable.↩
30. Petitioner, through his family, owned a controlling interest in People's Bank. He was also on its board of directors and a member of the executive committee. Nevertheless, without a breach of his fiduciary duty petitioner could not have prevented the bank from applying his pledged stock against the obligations of Euwer's in the event of that corporation's bankruptcy. Thus, we are satisfied that the pledged stock was imperiled.↩
31. Petitioner's testimony must, of course, be evaluated in light of his ownership interest in, and directorship with, those banks to which he had pledged stock for personal loans. (Petitioner was not so related to every such bank.) Although the degree of peril here is not as great as with the pledges made on behalf of Euwer's, we are satisfied from our examination of the record that petitioner's stock would have been imperiled in the event of the bankruptcy of Euwer's.↩
32. Again we have evaluated petitioner's testimony in light of the extent of his ownership interest in the various banks and conclude that a rational basis existed for his concern for his position.↩
33. From 1972 through 1976 petitioner reported the following gross receipts, gross profit, and net profit (or loss) in respect of Veech's: ↩
1972
1973
1974
1975
1976
Gross receipts
452,907
459,440 435,426 422,132 408,817 Gross profits
195,418
188,979 187,729 177,227 182,471 Net profit
(or loss)
12,179
(14,846)
(9,243)
(31,275)
(33,260)
34. Petitioner does not maintain that he was in the trade or business of being either a banker or a bank employee. ↩
35. We also believe that petitioner's contention runs afoul of those cases which hold that a corporation's trade or business is separate and distinct from that of its shareholders and employees. Burnet v. Clark, 287 U.S. 410 (1932); Estate of Byers v. Commissioner, 57 T.C. 568, 578 (1972), affd. per curiam 472 F.2d 590↩ (6th Cir. 1973).
36. In this regard the following interchange between respondent's counsel and petitioner is of consequence: Q. So, is it not fair to say that your involvement in all these businesses is simply as a figurehead, and the day-to-day operation is done by any or all of your general managers of each of these concerns? A. I guess that's one way to say it.
Q. So that your services to these organizations, any services that you render to these organizations were actually for the purpose of producing income in the forms of dividends or the enhancement of the value of your stock in each of these organizations? A. Right.↩